(830 P.2d 1210)

No. 65,133 ∎

STATE OF KANSAS, *Appellee*, v. FETHI EL AYADI, *Appellant*.

Opinion
filed August 23, 1991.

*Elizabeth Sterns*, assistant appellate defender, *Benjamin C. Wood*, special appellate defender, of Overland Park, and *Jessica R. Kunen*, chief appellate defender, for the appellant.

*Thomas J. Bath, Jr.*, assistant district attorney, *Paul J. Morrison*, district attorney, and *Robert T. Stephan*, attorney general, for the appellee.

Before LEWIS, P.J., ELLIOTT, J., and E. NEWTON VICKERS, District Judge, assigned.

LEWIS, J.: The defendant appeals his convictions of rape and aggravated sodomy. As a result of these convictions, the defendant

was sentenced to consecutive terms of 5 to 20 years on each charge, for an effective sentence of 10 to 40 years.

The defendant is a citizen of the United States but a native of Tunisia. He speaks English, along with five other languages. The victim, whom we shall refer to as J.C., is a quadriplegic, having been paralyzed from the neck down in a 1975 automobile accident. Both parties are relatively well educated and both are employed. The defendant has attended the University of Paris. He testified he is fluent in six languages and, at the time of the incident which gave rise to this prosecution, he was the sales manager for Metagram of America, Inc., which is an answering service with a full message paging system.

J.C. is a graduate of Emporia State University with a degree in English. She is employed by Harpo's Bar Supply. Despite her physical limitations, J.C. is mobile. She drives her own specially equipped van and moves around outside of that van in a wheelchair. J.C. lives with her parents in Stanley, Kansas, and employs a nurse's aide who comes to her home every morning to care for her hygiene and assist her in getting ready for work. J.C. is regularly employed and maintains an active social life.

The factual pattern presented appears to be illustrative of what is now commonly referred to as "date rape." There is no question but that the parties had a date, kissed in J.C.'s van, and had sex in that van. J.C. testified that she told the defendant "no" on several occasions and that the sex was nonconsensual. The defendant, on the other hand, admits that he had sex with J.C., but he said that it was conduct in which both parties were willing participants and that nothing was done without J.C.'s consent.

We will briefly summarize the events of the evening in question. Due to a prearranged understanding, J.C. and the defendant met at a bar in Overland Park, had some drinks, and engaged in general conversation. J.C. told the defendant some of the details of her physical condition, including the fact that, despite her limitations, she was able to have sex but could not have children. She explained to the defendant that, while she did not have much feeling from the chest down, she did have some dull sensation during sexual intercourse. The defendant told much the same story, although he indicated that J.C. told him of prior

sexual experiences and was quite specific in explaining what she could and could not do.

After some period of time in engaging in conversation and drinks, the parties left the bar, and J.C. drove the defendant back to a parking lot where his car was located. J.C. parked the van, and the parties kissed. Both agree that the kissing was consensual.

It is at a point during or after the kissing that the stories become divergent. According to J.C., the defendant became increasingly amorous and demanding. When the defendant sought to force himself on her, J.C. told him, "No, I have to go home," on several occasions, to no avail. Ultimately, according to J.C., the defendant's size and strength prevailed. He placed his penis in her mouth and finally engaged in nonconsensual intercourse with her. The defendant testified that both parties freely participated in the sexual activities that took place in the van and that J.C. never asked him to stop.

After the events described, the defendant left the van and returned to his automobile. J.C. then went home and, in order to prevent her mother from finding out what had taken place, she had her stepfather place her in bed fully clothed.

The evidence indicated that the morning after the rape, J.C.'s nurse's aide noticed that J.C. had a cut on her tailbone and that she had bled through her underwear, her skirt, and onto the sheet. The aide inquired what had happened to J.C., and J.C. told her that she had been raped, but she made her promise not to tell. J.C. also testified that, shortly after the rape, she called the rape crisis hotline and spoke with a rape counselor. J.C. and the rape counselor discussed the question of whether the rape should be reported. On March 8, 1989, two weeks after the alleged rape had taken place, J.C. contacted the police and told them she had been raped.

We are not the trier of fact, but it appears to us that this was a very close and difficult case to resolve. The jury in this case deliberated for over 11 hours, after three days of testimony, and, at one time, the record indicates there was an eight to four vote in favor of acquittal. Ultimately, the jury convicted the defendant.

The defendant appeals, contending that he was deprived of a fair trial by the conduct of the trial judge. He also contends that

he is entitled to a new trial on the grounds of newly discovered evidence. We agree with the defendant on his latter contention, and we reverse and remand for a new trial on those grounds. As a result, we do not reach the question concerning the conduct of the trial judge.

After the defendant's conviction, a motion for new trial was filed. This motion came regularly on for hearing and was denied by the trial court.

The record reflects that, three or four days after the denial of the first motion for a new trial, the defendant's attorney received an anonymous message on his answering machine. The caller advised counsel that he had read about the denial of the motion for a new trial in the newspaper. He went on to say that there were people who wanted to come forward but did not think there would be a conviction. The caller went on to say that there was information that counsel needed to know, but he failed to disclose that information. The next day, that same person left another message on counsel's answering machine, disclosing the name and telephone number of Linda K. Rogers and saying, "This is a person that may know something about the case." Defendant's counsel took this information, located Rogers, interviewed her, and filed a motion for new trial on the basis of newly discovered evidence. Rogers' testimony is that newly discovered evidence.

Rogers was called as a witness at the hearing on the second motion for a new trial. She testified that, while she did not know the defendant, she was acquainted with J.C. and considered her to be a friend. She also related that J.C. was a regular customer of the Martin City Pub, a bar in which Rogers worked. She testified that, on the day after the alleged rape, J.C. came to the Martin City Pub. J.C. advised Rogers that she needed to telephone "some foreign guy" whom she had gone out with the night before. The witness assisted J.C. in making this telephone call and testified she had a conversation with J.C. about the events of the night of the alleged rape:

"Q. . . . . Do you recall, do you have a recollection of whether she described this individual as foreign or not?

"A. I'm positive that she said he was a foreign guy. I think that is the term she used. I remember foreign. I don't remember exactly what else.

"Q. Okay. Thank you. Did she inform you of what she and this individual had done the prior night?

"A. She said that they had been on a date and that they had had sex in her van.

"Q. Did she describe it any further than that?

"A. Said that he had been rough with her and that it had lasted a long time and that she was tired, had gotten worn out. And I said, 'Did you tell him to stop?' And she said, 'No.'

"Q. Did she indicate to you one way or the other about whether she was consensually having sex with this individual?

"A. I don't think she said the word consensual, but she didn't indicate that it was against her will.

"Q. Okay. Did she ever indicate to you that she had told him no, she didn't want to have sex?

"A. No.

"Q. Is there anything else that you recall about her description of what happened that prior night?

"A. No.

"Q. Do you recall, did you assist her in using the telephone?

"A. Yes. More than once. Several times. I don't remember if it was more than twice. At least a couple of times.

"Q. Was the purpose of that assistance to help her call this foreign individual?

"A. I didn't know at the time, but then a little bit later when she was talking to me she said that she was trying to get ahold of the guy that she had been out with the night before because he was supposed to meet her.

"Q. All right. Did she say anything else about the purpose of her calling that individual?

"A. That she wanted to talk to him, that they were supposed to meet and she was trying to get ahold of him to see if, I think, they were still going to meet or go out or something.

"Q. Okay.

"A. She said that she wanted to talk to him about that night, the night before.

"Q. Anything further?

"A. No, no."

On cross-examination, the following testimony was elicited:

"Q. Your testimony has been everything you could glean from the conversation with [J.C.] was that the sex was consensual?

"A. That is the impression I got.

. . . .

"Q. Was it your impression that she wanted to go out with him again?

"A. Yes. That is the impression I got from what she told me."

The trial court denied the motion for a new trial on the basis of Rogers' testimony, stating as follows:

"THE COURT: The witness gave contradictory testimony as to when she last saw the victim in this case, so there may be some basis even for questioning the credibility of the witness. But again, that would not be in the Court's opinion sufficient to determine the issues of the motion for new trial. The primary basis for determining this motion is a review of the testimony that would be proffered by Linda K. Rogers and how that relates to the trial testimony of the victim, and the Court finds that the proffered testimony does not contradict the testimony of the victim in any material manner, but for the most part corroborates her testimony. The evidence proffered by the witness Rogers can't under any stretch of the imagination be construed as such materiality that it would be likely to produce a different result.

. . . .

"THE COURT: The Court first finds, first of all, that the evidence was not obtained because there is not diligence in hunting for it. It was available, could have been found, but the defense was not diligent in getting it. Secondly, there is a question of credibility which I have mentioned, and thirdly the Court finds that the testimony proffered would not under any circumstances be sufficient to justify the granting of a new trial and is not considered by the Court to be of such materiality that it would be likely to produce a different result upon retrial. Accordingly, the motion must be and is hereby denied."

The rules governing motions for granting a new trial on the grounds of newly discovered evidence are well settled. Recently, in *Baker v. State*, 243 Kan. 1, 11, 755 P.2d 493 (1988), the Supreme Court reiterated the rules which govern this issue.

" ' "The granting of a new trial for newly discovered evidence is in the trial court's discretion. (*State v. Larkin*, 212 Kan. 158, 510 P.2d 123, *cert. den.* 414 U.S. 848, 38 L. Ed. 2d 95, 94 S. Ct. 134.) A new trial should not be granted on the ground of newly discovered evidence unless the evidence is of such materiality that it would be likely to produce a different result upon re-trial. (*State v. Hale*, 206 Kan. 521, 479 P.2d 902.) The credibility of the evidence offered in support of the motion is for the trial court's consideration. (*State v. Anderson*, 211 Kan. 148, 505 P.2d 691; *State v. Larkin*, [212 Kan. 158].) The burden of proof is on defendant to show the alleged newly discovered evidence could not with reasonable diligence have been produced at trial. (*State v. Lora*, 213 Kan. 184, 515 P.2d 1086; *State v. Arney*, 218 Kan. 369, 544 P.2d 334.) The appellate review of an order denying a new trial is limited to whether the trial court abused its discretion. (*State v. Campbell*, 207 Kan. 152, 483 P.2d 495; *State v. Anderson*, [211 Kan. 148].)" ' "

It is also well settled that, when the newly discovered evidence merely tends to impeach or discredit the testimony of a witness,

a new trial will not be granted. *Baker*, 243 Kan. at 11. See *State v. Foy*, 224 Kan. 558, 569, 582 P.2d 281 (1978).

We have reviewed the record and have reviewed the action of the trial court in the light of the authorities cited above. Our conclusion is that the trial court abused its discretion in denying defendant's motion for a new trial.

First of all, we believe the evidence was clearly material and, under the facts presented, the testimony of Linda K. Rogers could very likely produce a different result. In reaching this conclusion, we note that the consent of the victim was a very close question with which the jury obviously agonized for several hours. We cannot predict with certainty the impact of Rogers' testimony upon the jury. However, based upon our review of the record, we believe that it is not unreasonable to conclude that it would have had a significant impact upon the jury's consideration.

In *State v. Baker*, 243 Kan. at 12, the Kansas Supreme Court adopted a new definition of materiality as it relates to newly discovered evidence. That definition was set out in the United States Supreme Court decision of *United States v. Bagley*, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985). In that decision, the United States Supreme Court stated: "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

We have concluded that a reasonable probability exists that, had Rogers' testimony been heard by the jury, the result of the proceeding would have been different.

Rogers' testimony goes to the very heart of the prosecution. The only question in this case was whether the sex in the van between J.C. and the defendant was consensual. If one believed the testimony of J.C., it was not consensual. If one believed the testimony of the defendant, it was consensual. The testimony of Rogers directly contradicts the testimony of the victim on the issue of whether the activities in the van were consensual. We have reviewed the record and J.C.'s testimony that on several occasions she told the defendant to stop, that she told him "no," and that she told him that she needed to return home. Rogers' testimony directly contradicts the victim in this regard. According

to Rogers, J.C. never advised the defendant to stop; she did not tell him "no"; and she did not tell the defendant that she did not want to have sex. This testimony, along with the other testimony of Rogers on cross-examination, is certainly material; it goes to the very heart of this prosecution, and a jury should determine its ultimate effect.

We hold that Rogers' testimony was material in every aspect, and there is a reasonable probability that this testimony, had it been presented to the jury, might have resulted in a different outcome. Under these circumstances, we are unwilling to see the defendant serve from 10 to 40 years in the penitentiary when there is evidence which might very well exonerate him but is withheld from the trier of fact on the basis of a technical interpretation of the law.

We also disagree with the trial court's conclusion that defense counsel did not use reasonable diligence in discovering this evidence. Our reading of the record indicates that defense counsel used the utmost diligence in seeking to uncover any and all relevant evidence.

The record shows that, in preparing for the defense, counsel did the following: (a) He used defendant's answering or paging service to find out that J.C. had called the defendant on the day after the alleged rape; (b) he used computer printouts from the paging service to trace the phone numbers and find out where J.C. had called defendant from; (c) he followed the trace to the Martin City Pub and made a personal visit to the Martin City Pub to inquire if anyone knew J.C. or anything relevant to the crimes charged against the defendant; (d) he testified that, in asking the people at the pub if they knew or heard anything, no one would talk to him, and this was particularly true after they found out he was the defense attorney. It seemed as if these witnesses may have known something but were simply not willing to cooperate; (e) he went to a bar called the Upper Deck and inquired; (f) he went to a bar called Houlihan's and inquired; (g) he went to an establishment known as Applebee's and inquired; and (h) he went to an establishment known as Dundee's and inquired.

Despite all of his diligence, counsel was unable to find anyone who was willing to discuss the alleged rape with him or to reveal

to him names of individuals who may have had relevant information. It appears to us that defense counsel exhausted every lead he could possibly think of. The individuals at the Martin City Pub who had the information simply refused to talk to him. He did everything he could do, certainly within the definition of reasonable diligence. We conclude that the trial court erred in holding that defense counsel did not use reasonable diligence in attempting to discover the evidence presented as a basis for a new trial.

Our review of the record does not reveal that credibility is an issue that we must resolve. The trial judge, in his review of the evidence, indicated that there was some question of credibility, but that the issue of credibility was not the basis for his refusal to grant a new trial. We have reviewed the record in the light of the trial judge's finding and agree with him that there was not sufficient evidence to indicate that a lack of credibility would be a sufficient basis for denying the motion for a new trial.

Based upon our review of the entire record in this matter, we have no choice but to reverse the trial court and order that a new trial be granted to the defendant on the grounds of newly discovered evidence.

In view of our decision on the motion for new trial, the other issues presented by the defendant are moot, and we do not reach them. We note that the trial judge in this case has since retired, and the retrial will be conducted before a different judge.

Reversed and remanded.