No. 107,159

STATE OF KANSAS, *Appellee*, v. CEDRIC WARREN, *Appellant*.

(356 P.3d 396)

Opinion filed August 28, 2015.

*Patrick H. Dunn*, of the Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Sheryl L. Lidtke*, chief deputy district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

JOHNSON, J.: Charles Ford and Larry LeDoux were killed in a shoot-out during an attempted drug-house robbery. Brandon Ford, who survived the incident and who previously knew Cedric Warren, named Warren as one of the two shooters and later identified Warren's codefendant, Dominic Moore, as the second killer. Warren and Moore were tried together, and a jury convicted Warren of one count of premeditated first-degree murder, one count of intentional second-degree murder based on an aiding and abetting theory, and one count of attempted premeditated first-degree murder. The district court imposed a life sentence with a minimum

term of 50 years (hard 50 life sentence) for the first-degree premeditated murder conviction.

On direct appeal to this court, Warren argues that (1) the district court violated his right to an impartial jury by denying his motion for a mistrial after a potential juror's comments irreparably tainted the jury pool; (2) the district court violated his right to an impartial jury by denying his motion for mistrial after a State's witness made improper, prejudicial comments; (3) the district court erred in denying his motion for a new trial based on newly discovered evidence; (4) the district court erred in denying his motion to sever his trial from Moore's trial, based on antagonistic defenses; (5) the district court denied his constitutional rights by instructing the jury that it could return a verdict of guilty upon proof of any element of the charged offense, rather than proof of each element of the charged offense; (6) cumulative error denied him a fair trial; (7) the hard 50 sentencing scheme is unconstitutional; (8) his hard 50 sentence is illegal; and (9) the district court erred by ordering lifetime postrelease supervision.

Finding no reversible error, we affirm Warren's convictions. But pursuant to *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151, 2160-63, 186 L. Ed. 2d 314 (2013), and *State v. Soto*, 299 Kan. 102, 124, 322 P.3d 334 (2014), we must vacate the hard 50 life sentence and remand the case to the district court for resentencing.

## Factual and Procedural Overview

On February 13, 2009, Brandon, Charles, and Larry spent most of the day at a house in Kansas City, Kansas, which was used by Charles and Larry to facilitate their drug transactions. Charles was armed with a loaded nine millimeter Glock and Larry kept a loaded AK-47 within his reach, but Brandon was initially unarmed when two men came to the house that evening.

Although his description of the events changed several times prior to trial, one of Brandon's initial stories to the police had him walking toward the bathroom when two men entered the house, one of whom he knew as "Ced." As he entered the bathroom, Brandon said he heard someone say "where's the shit" or "give me the shit," immediately followed by gunshots. Brandon exited the

bathroom and saw a short black male holding a gun, whereupon he ducked into a bedroom, locked its door, and retrieved a weapon. Brandon exchanged gunfire through the closed bedroom door with someone outside. After the shots subsided, Brandon looked out the window and saw two men running toward an SUV. Brandon exited through the bedroom window, ran to a nearby house, and asked the resident to call the police.

When police arrived at the residence, they found Charles' body near the front door surrounded by several different types of cartridge casings and Larry's body in the dining room with .40 caliber Smith and Wesson spent cartridges scattered nearby. Police also discovered a locked bedroom door riddled with bullet holes. A police officer broke down the door and observed an open window in the bedroom.

Although no weapons were found in the house, police recovered multiple gun magazines and a significant amount of ammunition. Police also discovered a black bag hidden inside a clothes dryer; the bag contained packets of cocaine.

Brandon was transported to the police station and shown a line-up, from which he identified Warren as the individual he knew as "Ced." The day after the murders, police apprehended Warren and Moore at a house in Kansas City, Missouri. A search of the Missouri house revealed several weapons, including a Glock nine millimeter semi-automatic handgun, and drugs, all hidden within an air duct. Brandon was later able to select Moore out of a line-up as the short black man he saw in the hallway.

Warren was charged with the premeditated first-degree murder of Larry; the intentional second-degree murder of Charles, based on an aiding and abetting theory; and the attempted premeditated first-degree murder of Brandon. At trial, Brandon testified that he was sitting in the living room when he saw Warren come up the stairs after entering the house. Brandon said that Warren went straight into the kitchen and began shooting at Larry. Brandon ran to the bedroom to retrieve a weapon; but he said that he was able to see Moore, through the cracked bedroom door, also come up the stairs after entering the house. Brandon admitted that his trial testimony was inconsistent with previous statements, wherein he

said he was in the bathroom when shots were fired. Brandon was extensively cross-examined on his inconsistent testimony.

A KBI firearms expert testified that the casings found at the crime scene came from three different guns, one of which was the Glock seized from the Missouri residence. Specifically, two cartridge casings found under Charles' body were fired from the Glock. A KBI forensic scientist testified that a sample taken from the Glock was consistent with Moore's DNA profile. The KBI firearms expert testified that the bullet recovered from Larry's body was a .40 caliber full metal jacket round, but he was unable to tie it to a particular spent cartridge or to identify the type of weapon from which it was fired.

Warren presented two alibi witnesses in his defense. His stepmother, Nicole Carter, testified that on the night of the murders, Warren was at her house until approximately 11 p.m., when he left to go to a music show with his father. Warren's father, Cedric Toney, testified that he dropped Warren off at a friend's Kansas City, Missouri, house around midnight. The murders were alleged to have taken place around 11 p.m. Moore did not present any evidence in his defense.

The jury convicted both defendants as charged. Warren filed a motion for new trial, which the district court denied. The State filed a motion for imposition of a hard 50 sentence for Warren's first-degree murder conviction under K.S.A. 21-4635, which the district court granted. Warren's sentences for the two other convictions were ordered to be served concurrently with the hard 50 life sentence. Warren filed a timely appeal.

### MOTION FOR MISTRIAL BASED ON POTENTIAL JUROR'S STATEMENTS

Warren's first issue concerns comments made by a member of the venire during voir dire. The potential juror, C.W., expressed fear over rendering a guilty verdict because the defendants had access to the juror questionnaires, which contained his personal information, specifically stating,

"[E]very time we talk they flip through these papers. It's got my name on it, it's got where I work on it, it's got my family, it's got everything, and if I stand up in

court and say hey, they're guilty, they're like, hey, that's number 4, that's [C.W.]. They know where I work, they know where I live, what if he gets mad? That's how I look at it."

The prosecutor followed up by inquiring whether C.W.'s apprehension would interfere with his jury duty and C.W. responded, "Kind of, yeah, because if I stand up and say hey, you're guilty, they know my name, where I work and my family. That makes you feel kind of awkward, don't you think?" C.W. explained that even if the jury rendered a guilty verdict and the defendants went to jail, nevertheless "[t]hey know people. People know people."

Thereafter, the district court conducted a bench conference at which defense counsel requested a mistrial, arguing that the jury pool had been "poisoned at this point beyond—possibly beyond salvation." The prosecutor argued that any possible prejudice could be cured by informing potential jurors that while the defendants could review the questionnaires during jury selection, they did not have access to the questionnaires during the trial. The district court took the motion for mistrial under advisement and thereafter provided the following instruction to the jury pool:

"All right. I guess based upon [C.W.'s] comments, there's I wanted to clarify things. Obviously, this is a serious case and there are serious charges, here. As the defendants sit here, they are presumed to be innocent. The State has the burden to prove their guilt beyond every reasonable doubt as to the elements with which they are charged. It is also their right to have a jury trial, and that is why all of you have been summoned in here to come down here and go through this process. That's why I've asked you questions, Miss Lidtke has asked you questions and counsel will ask you questions.

"The questionnaires that he referred to are simply in order to try to speed up the process as opposed to questioning each of you individually. These questionnaires are used in every trial that we conduct here in Wyandotte County, they have been used for many years, and it's the best possible way that we have come up with to expedite the process as much as we possibly can.

"I understand that there's concerns about your names being on there and information, but those questionnaires are not kept by anyone but the Court. They are collected and destroyed. There is nothing that anyone—the attorneys, the defendants, anyone else will have any information regarding anything what is on those questionnaires. But that is the process that we have, that is the process that we use in every jury trial, whether it's a civil trial or a criminal trial, so with that, Miss Lidtke, let's move on."

Despite the district court's instruction, C.W. still expressed doubt over whether he could return an appropriate verdict. Consequently, the prosecutor moved, without objection from defense counsel, to strike C.W. for cause. The district court took the motion to strike under advisement.

Voir dire thereafter continued without any other potential juror expressing any safety concerns. Of note, at the close of her voir dire examination, the prosecutor specifically asked the jury pool if there was anything else that needed to be addressed or considered when determining whether a potential juror should serve on the jury. None of the potential jurors expressed any concerns about their safety or the defendants having access to their personal information. Similarly, at the close of Warren's voir dire examination, defense counsel specifically gave the jury pool the opportunity to discuss anything that they thought would prevent them from acting as fair and impartial jurors, but none responded.

The district court subsequently granted the prosecutor's motion to strike C.W. for cause but denied the defendants' motion for mistrial, finding that while the jury pool may have visibly reacted to the potential juror's comments, "the record should be perfectly clear no one was nodding their head in agreement, no one was raising their hand to come forward, no one anticipated any further questions when the broadest possible question was asked, is there anything we should know about?" The district court found that if any member of the jury pool had concerns for their safety, or believed such concerns would prevent them from serving as a fair and impartial juror, they had ample opportunity to express their concerns. The district court therefore concluded that a mistrial was not appropriate.

Warren claims on appeal that C.W.'s comments irreparably tainted the jury pool and the district court's curative instruction did not purge the taint.

*Standard of Review*

We review a district court's decision denying a motion for mistrial for an abuse of discretion. *State v. Armstrong*, 299 Kan. 405, 442, 324 P.3d 1052 (2014). A district court abuses its discretion if

its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *State v. Waller,* 299 Kan. 707, 722, 328 P.3d 1111 (2014).

*Analysis*

Pursuant to K.S.A. 22-3423(1)(c), a district court may declare a mistrial if prejudicial conduct, inside or outside the courtroom, makes it impossible for the trial to proceed without injustice to the prosecution or defense. When evaluating a motion for mistrial under this provision, the district court must take the first step of deciding whether the prejudicial conduct created a fundamental failure in the proceeding. If so, the district court's second step is to decide whether the prejudicial conduct made it impossible to continue the proceeding without denying the parties a fair trial. *Armstrong,* 299 Kan. at 441-42. Under the second step, the court considers whether the conduct caused prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice. *State v. Ward,* 292 Kan. 541, 551, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

The question of whether a fundamental failure in the proceeding existed "varies with the nature of the alleged misconduct, such as whether the allegation is based on the actions of a witness, the actions of a bystander, prosecutorial misconduct, or evidentiary error." 292 Kan. 541, Syl. ¶ 4. Here, we are dealing with a potential juror's actions in expressing fear of retribution from the defendants. Although we have yet to address the precise issue presented here, we have considered cases involving a potential juror's prejudicial statements in the presence of the jury pool.

For example, in *State v. McCorgary,* 224 Kan. 677, 687, 585 P.2d 1024 (1978), a potential juror, who also happened to be the defendant's cousin, "expressed a strong feeling in front of other prospective jurors that what she had read in the paper about these murders was true." The potential juror was excused from service, but the defendant moved for a mistrial before voir dire was completed. The motion was denied, but the jury was instructed to disregard statements by prospective jurors and to not consider what they may have read in newspapers. On appeal, we held that the

district court did not abuse its discretion in denying the motion for a mistrial because there was no evidence that the defendant's rights had been substantially prejudiced. 224 Kan. at 687.

Similarly, in *State v. Mayberry*, 248 Kan. 369, 380, 807 P.2d 86 (1991), *disapproved on other grounds by State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006), the defendant argued that the trial court erred in denying his motion for a mistrial based upon a potential juror's statement that he knew about the defendant from his previous conviction. The juror was excused for cause, and the district court instructed the jury to disregard any information concerning the case other than the evidence presented at trial. Once again, we held that the district court did not abuse its discretion in denying the motion for mistrial because there was no showing of substantial prejudice to the defendant's right to a fair trial. 248 Kan. at 381.

More recently, in *State v. Betancourt*, 299 Kan. 131, 322 P.3d 353 (2014), a potential juror, during voir dire, disclosed that she had heard that the murder case was gang related. Prior to voir dire, the district court had granted a motion in limine precluding any evidence of gang membership during the trial. The defendant moved for a mistrial based on a violation of the order in limine and because the jury panel was allegedly tainted. The district court denied the motion for mistrial. Citing cases from other jurisdictions dealing with prospective jurors' prejudicial comments during voir dire, we held that the district court did not abuse its discretion in denying the motion for mistrial because there was no prejudice to the other jury members. 299 Kan. at 146. We reasoned:

"The juror mentioned gang involvement only in passing, and the topic was not brought up again. The defense did not ask for permission to conduct an examination of the jury for prejudice and did not request an instruction directing the jury to disregard unsworn statements by jury members. Furthermore, the defense did not seek to strike the juror in question for cause." 299 Kan. at 146.

On the other side of the argument, Warren points to *State v. Yurk*, 230 Kan. 516, 638 P.2d 921 (1982). There, during the course of an aggravated robbery trial, a juror read a newspaper article, which revealed that Yurk had three prior convictions related to larcenous activities. The juror initially stated that his ability to be fair and impartial would be affected by the newspaper article, ex-

plaining " 'the main thing that bothered me were the other charges that had been filed against the man and the convictions.' " 230 Kan. at 520. However, under further questioning by the trial judge, the juror stated he could render a fair decision, prompting the trial court to deny the defense motion for mistrial and to proceed with the trial. The *Yurk* majority found that the district court erred in denying the mistrial and continuing the trial because the single juror involved admitted that he was adversely influenced by the knowledge of defendant's prior convictions, and the juror's subsequent assurances of fairness could not protect the defendant's right to a fair trial. 230 Kan. at 523-24.

The *Yurk* court was concerned with the impartiality of a single juror who improperly read forbidden and prejudicial information about defendant's prior convictions during the course of the trial and admitted that the information bothered him. Here, we have no evidence that the impartiality of any sitting juror was actually prejudiced. Rather, Warren surmises that the actual jurors might have been adversely affected by overhearing the comments of an excused potential juror, notwithstanding the total absence of any direct statements of such influence. In other words, our circumstance more closely resembles that in *McCorgary*, *Mayberry*, and *Betancourt*, where we found the respective jury pool was not tainted by a venireperson's prejudicial comment and, consequently, no abuse of discretion in the district court's denial of a mistrial.

In this case, the district court noted that no one in the jury pool appeared to agree with C.W.'s comments and that no one expressed any similar personal safety concerns when asked if there was anything the parties or court should know about. Pointedly, Warren's counsel did not request an individual polling of the jury pool to investigate the existence of any prejudice. In short, there is no evidence of record indicating that the jury pool was, in fact, prejudiced by C.W.'s comments. Therefore, we conclude that the district court did not abuse its discretion in determining that C.W.'s comments did not constitute a fundamental failure in the proceedings.

Notwithstanding the foregoing holding, we pause to note that the district court in this case took the appropriate curative and mitigation measures to assure that Warren suffered no injustice from C.W.'s remarks. Warren's assertion that *United States v. Blitch*, 622 F.3d 658 (7th Cir. 2010), required the district court to *sua sponte* poll the jury pool is unavailing because of the factual distinction that the persons expressing personal safety fears in *Blitch* actually sat as jurors in the case. Our circumstance is more analogous to that in *United States v. Small*, 423 F.3d 1164 (10th Cir. 2005), where a venireperson expressed doubt as to his impartiality because of safety concerns based on the number of marshals present in the courtroom. The district court denied a defense motion for mistrial but explained to the jury pool that the number of marshals was due to the number of defendants, not to concerns about potential violence. The *Small* Court upheld the denial of defense counsel's mistrial motion, finding that "[a]ny prejudice that may have resulted from the statement of the venireperson was adequately addressed by the district court's explanation of the presence of the marshals in the courtroom." 423 F.3d at 1180. Here, the district court adequately explained the use of the jury questionnaires.

In short, we find that the district court did not abuse its discretion in denying Warren's motion for mistrial.

### MOTION FOR MISTRIAL BASED ON WITNESS' TESTIMONY

Warren similarly argues that the district court violated his right to an impartial jury by denying his motion for mistrial after a State's witness, Detective Brian Block, testified that he knew Warren *and his associates*. Warren claims that because the jury "entered the trial with safety concerns raised by [C.W.] regarding the defendants *and* their friends, such an answer undoubtedly aggravated these concerns." We disagree, discerning no fundamental failure in the proceedings.

*Standard of Review*

We apply the same standard of review and legal framework as applied to Warren's first issue, namely whether the district court

abused its discretion in denying the motion for a mistrial. See *Armstrong*, 299 Kan. at 442.

*Analysis*

During the trial, Detective Block, in explaining why he placed Warren in a photo line-up after Brandon identified one of the shooters as "Ced," stated that he was "familiar with Cedric Warren and his associates." Warren's defense counsel thereafter moved for a mistrial, arguing that the jury now believed that the police were familiar with his client and his "associates," which made it sound like Warren was in some sort of "syndicate." The district court overruled the motion, but stated, "Let's limit what's talked about to just Cedric Warren. He's established he knew him so he put him in there. I don't think he should state with associates or any connotation that might have."

On appeal, Warren argues that the jury had already been tainted by C.W.'s comments that the defendants "know people. People know people." Warren claims this taint was exaggerated by Block's reference to Warren "and his associates." Warren also asserts that Block's comment carried the unnecessary implication that "Warren was a dangerous gang member."

In *State v. Ransom*, 288 Kan. 697, 207 P.3d 208 (2009), the defendant was charged with two counts of felony murder after he and three others made plans to rob a drug house. Prior to trial, the defendant filed a pretrial motion in limine to prevent introduction of evidence about his involvement with gangs, arguing that such evidence was immaterial, irrelevant, and inadmissible. The State agreed that it would not offer any evidence of the defendant's gang affiliation, and the district court sustained the motion. At trial, the lead detective on the case, in testifying about her efforts to locate the four suspects, mentioned "gang officers" before defense counsel interrupted with an objection. The defendant then moved for a mistrial, but the district court overruled the motion, finding that the State did not design its question to elicit a response about gangs and thereafter instructed the jury to ignore the officer's response that a gang unit was asked to investigate because neither the State

nor the witness was suggesting the defendant was affiliated with a gang.

On appeal, this court held that the defendant could

"demonstrate no substantial prejudice from Bachman's brief reference to 'the gang officers.' Even if witness preparation and the detective's experience—along with the fact that this detective sat at counsel table during trial and had been present when the admonition was given to other witnesses—should have prevented the reference, it was innocuous. We are confident that it did not create an unduly prejudicial impression that Ransom was involved in a gang or gang activity. Indeed, the district judge's admonition was emphatic in dispelling any weak association that could have arisen in the minds of jurors. As it happened, Ransom may have received a great deal more in the way of a court endorsement because of the detective's mistake than most criminal defendants have a right to expect." 288 Kan. at 715.

In the present case, Block's reference to Warren "and his associates" is even more isolated and innocuous than *Ransom's* gang reference. Granted, the district court in this case did not provide a cautionary instruction to the jury, but on the other hand, the detective was not laboring under a limine order prohibiting the mention of the defendant's associates.

Moreover, as the State points out, another witness in this case, Detective Dion Dundovich, specifically testified, without objection, that at the time of the murders, he was assigned to the FBI Violent Crime Gang Task Force. Dundovich explained that he was contacted to assist with the present case because he was familiar with Warren based on his association with a gang called "the Mob." Even though Dundovich testified after Block, Warren did not object to his testimony or move for a mistrial. In addition, Warren does not argue, on appeal, that Dundovich's testimony was prejudicial or aggravated the alleged prejudice caused by Block's testimony.

In short, Block's brief reference to "his associates" did not constitute a fundamental failure in the proceedings and the district court did not abuse its discretion in denying the motion for a mistrial.

### MOTION FOR NEW TRIAL

Next, Warren argues the district court abused its discretion by denying his motion for a new trial based on newly discovered evidence. In the alternative, Warren argues that the district court abused its discretion in refusing to hold an evidentiary hearing on his motion for a new trial.

### Standard of Review

A district court's order denying a request for a new trial based on newly discovered evidence is reviewed under an abuse of discretion standard. *Moncla v. State*, 285 Kan. 826, 839, 176 P.3d 954 (2008). Judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *Waller*, 299 Kan. at 722. Warren bears the burden of demonstrating an abuse of discretion. See *State v. Laurel*, 299 Kan. 668, 676, 325 P.3d 1154 (2014).

### Analysis

Warren argues that new evidence, by way of two letters and an affidavit attached to his brief, entitled him to a new trial. At the outset of our analysis, we note that the letters and affidavit were appended to Warren's brief but were never formally introduced as evidence in the proceedings below or added to the record. Therefore, our analysis is limited to defense counsel's proffer regarding the letters and affidavit, which occurred prior to sentencing, when the district court took up the motion for new trial. See Kansas Supreme Court Rule 6.02(b) (2014 Kan. Ct. Rule Annot. 41) ("The appendix is for the court's convenience and is not a substitute for the record itself."); *Edwards v. Anderson Engineering, Inc.*, 284 Kan. 892, Syl. ¶ 1, 166 P.3d 1047 (2007) ("The court will not consider appended items which are not found in the appeal record.").

At the hearing, defense counsel explained that because he did not have the authors of the letters and affiant present to testify, he would represent, by way of proffer, that the two letters and affidavit were authored by inmates, who purported to be in jail with Bran-

don at various points in time during 2010 and with whom Brandon discussed the murders. The attorney claimed that one of the inmates stated that Brandon admitted that Warren was not present on the night of the murders and did not commit the murders; and that another inmate stated that Brandon confessed to framing Warren for the murders. While defense counsel referenced the affidavit, its contents were not specifically proffered. The defense argued that the evidence constituted newly discovered material that warranted a new trial, or at least further exploration to determine whether the inmates' allegations were true. The district court denied the motion for new trial, finding:

"As to the statements made by [Brandon] after his testimony, or to these other inmates at some point, I would concur with the State's argument that these are to be reviewed with caution. Obviously these inmates did submit affidavits, but there's nothing in there or anything that's been presented to this Court that finds them to be credible to the point that a new trial would be warranted on that basis."

Warren first argues that given Brandon's lack of credibility, the district court abused its discretion in failing to grant a new trial based on the allegations contained in the letters and affidavit. When determining whether a new trial is warranted on the basis of newly discovered evidence, the court considers whether: (1) "the new evidence could not, with reasonable diligence, have been produced at trial," and (2) "the evidence is of such materiality that it would be likely to produce a different result upon retrial." *Laurel*, 299 Kan. at 676.

Here, the first factor is not at issue because the district court treated the letters and affidavit as newly discovered evidence but denied the motion for new trial based on the materiality of the evidence. Specifically, the district court determined that, as presented, the newly discovered evidence lacked sufficient credibility to warrant a new trial. In determining whether newly discovered evidence is material,

"the district court must assess the credibility of the newly proffered evidence. See *Cook*, 281 Kan. at 993; *State v. Richard*, 235 Kan. 355, 363, 681 P.2d 612 (1984). Ordinarily, a new trial is not warranted when the newly proffered evidence merely tends to impeach or discredit the testimony of a witness. *Richard*, 235 Kan. at

363; *State v. Watson*, 204 Kan. 681, 685, 466 P.2d 296 (1970); *State v. Ayadi*, 16 Kan. App. 2d 596, 601-02, 830 P.2d 1210, *rev. denied* 250 Kan. 806 (1991). But, even when the evidence tends to impeach the testimony of a witness, the presence or absence of corroborating evidence is another factor to consider in determining whether the newly discovered evidence is of such materiality that it is likely to produce a different result upon retrial. See *State v. Norton*, 277 Kan. 432, 441-42, 85 P.3d 686 (2004); *State v. Smith*, 39 Kan.App.2d 64, 68, 176 P.3d 997, *rev. denied* 286 Kan. 1185 (2008)." *State v. Rojas-Marceleno*, 295 Kan. 525, 540, 285 P.3d 361 (2012).

Here, the State argued that the inmates' allegations were not credible, arguing that based on their pending charges, each inmate had a bias against the State. The district court apparently agreed, finding that there had been no showing of credibility with regard to the inmates' allegations.

But Warren counters that the "district court lacked substantial competent evidence to find the submitted documentary evidence incredible" and that "[n]o reasonable person could possibly disregard the written evidence in this case without holding an evidentiary hearing." Warren points to specific allegations contained within the letters and affidavits as evidence of credibility. However, as discussed, those documents are not a part of the record, so their specific allegations cannot be considered on appeal in determining whether the district court abused its discretion. The burden is on the appellant to furnish a record that affirmatively shows prejudicial error, and without such a record, we presume the actions of the trial court were proper. *State v. Goodson*, 281 Kan. 913, 919, 135 P.3d 1116 (2006).

Nevertheless, evidence of bias and motive is a valid method of attacking credibility. *State v. Ross*, 280 Kan. 878, 886, 127 P.3d 249, *cert. denied* 548 U.S. 912 (2006) (Proof of bias is almost always relevant to the finder of fact and weigher of credibility.). Moreover, "[w]e do not reassess a district judge's determination of credibility at a motion for a new trial hearing. [Citation omitted.] Zero credibility means zero materiality and zero chance that the outcome of a retrial would be different." *Laurel*, 299 Kan. at 676-77. Therefore, we hold that the district court did not abuse its discretion in denying the motion for new trial based upon a finding that the newly discovered evidence was not credible.

Moreover, even if the district court had conducted a hearing that established that Brandon had actually told inmates that Warren was not the shooter, that would not have established an effective recantation of Brandon's trial testimony. Recantation occurs when a witness formally or publicly withdraws or renounces prior statements or testimony. See Black's Law Dictionary 1295 (8th ed. 2004). Here, Brandon did not recant his prior testimony, but rather he just told different versions of what occurred. He did that prior to trial, and the defense vigorously cross-examined Brandon on the inconsistencies between his statements to police, his preliminary hearing testimony, and his trial testimony. That circumstance illustrates why evidence that merely impeaches a witness' trial testimony does not typically warrant a new trial. See *Rojas-Marceleno*, 295 Kan. at 540; see also *Smith v. Wichita Transportation Corp.*, 179 Kan. 8, 21, 293 P.2d 242 (1956) (newly discovered cumulative evidence does not warrant new trial).

A reasonable person could agree with the district court's determination that the proffered evidence was insufficiently material to warrant a new trial. Consequently, we find no abuse of discretion.

## MOTION TO SEVER

Warren claims that he and Moore had antagonistic defenses and the district court therefore erred in denying his motion to sever. Warren cannot clear the first hurdle; the two defenses were not antagonistic.

### Standard of Review

A trial court's denial of a motion to sever under K.S.A. 22-3204 will be reversed only when a clear abuse of discretion is shown. *State v. Winston*, 281 Kan. 1114, 1130, 135 P.3d 1072 (2006). The party claiming that a severance denial was error has the burden of establishing an abuse of discretion. *State v. White*, 275 Kan. 580, 589, 67 P.3d 138 (2003).

If the challenger establishes that the district court abused its discretion in refusing to sever a trial, the next step is to determine whether the severance denial resulted in prejudice. But the burden of demonstrating harmless error, *i.e.*, a lack of prejudice, is on the

party benefitting from the error. *State v. Carr*, 300 Kan. 1, 95, 331 P.3d 544 (2014).

*Analysis*

K.S.A. 22-3204 provides, in relevant part, that "the court may order a separate trial for any one defendant when requested by such defendant or by the prosecuting attorney." Severance should occur when a defendant has established there would be actual prejudice if a joint trial occurred. *State v. Davis*, 277 Kan. 231, 239, 83 P.3d 182 (2004).

Antagonistic defenses have been referred to as the "most compelling ground for severance." *State v. Myrick & Nelms*, 228 Kan. 406, 416, 616 P.2d 1066 (1980). However, a mere claim of antagonistic defenses is not enough. *State v. Pham*, 234 Kan. 649, 654, 675 P.2d 848 (1984). Instead, antagonistic defenses occur when "each defendant is attempting to convict the other" or "the defenses conflict to the point of being irreconcilable and mutually exclusive." *State v. Anthony*, 257 Kan. 1003, 1018, 898 P.2d 1109 (1995). "[A] mere inconsistency in trial strategy does not constitute an antagonistic defense." *State v. Aikins*, 261 Kan. 346, 361, 932 P.2d 408 (1997), *disapproved on other grounds by State v. Warrior*, 294 Kan. 484, 277 P.3d 1111 (2012). Similarly, presentation of evidence by one defendant that is inconsistent with the evidence presented by another defendant does not make the defenses antagonistic for purposes of severance. *State v. Reid*, 286 Kan. 494, 520, 186 P.3d 713 (2008). Instead, "[b]efore defenses of codefendants will be declared antagonistic there must be a dichotomy, or near dichotomy, between the defenses. The classic example of intrinsically antagonistic defenses is where both defendants blame each other for the crime while attempting to defend against the State's case." *Pham*, 234 Kan. at 655.

In his motion to sever, Warren alleged that Moore would blame him for the crimes charged in the complaint. The State objected to the motion to sever, arguing that Moore and Warren did not have antagonistic defenses and that judicial economy favored the cases being tried together. While Moore had initially filed a motion to sever, he later withdrew that motion and asserted that he pre-

ferred to have his case tried with Warren's. The district court denied the motion, finding that the defendants did not have antagonistic defenses and that the strength of evidence against Moore did not warrant severance.

At trial, Warren presented two alibi witnesses and Moore did not present any evidence in his defense. During closing argument, Warren's trial counsel argued that Brandon was not a credible witness due to his conflicting and inconsistent testimony; that there was no physical evidence linking Warren to the crime scene; and that Warren had an alibi for the night of the murder. In other words, Warren's defense was that he was not in the drug house when the victims were shot.

Similarly, Moore's trial counsel attacked Brandon's testimony as incredible, *i.e.*, Brandon's identification of Moore as the second shooter should not be believed. Further, Moore's attorney challenged the strength of the State's physical evidence linking Moore to the Glock and linking the crime scene shell casings to the Glock. In other words, Moore's defense was that he was not in the drug house when the victims were shot.

Simply put, Warren has failed to make even a cursory showing that the defenses in this trial were antagonistic. Consequently, he has failed to meet his burden of establishing that the district court abused its discretion in refusing to sever his trial from that of his codefendant, Moore.

### Jury Instruction·

For the first time on appeal, Warren argues that the reasonable doubt instruction given to the jury in this case erroneously lowered the State's burden of proof and that such an erroneous instruction must be considered structural error. We rejected this argument in *State v. Herbel*, 296 Kan. 1101, 299 P.3d 292 (2013).

*Standard of Review*

Warren did not object to the instruction below, therefore relief may only be granted if the instruction was clearly erroneous. See K.S.A. 22-3414(3).

"To determine whether an instruction or a failure to give an instruction was clearly erroneous, the reviewing court must first determine whether there was any error at all. To make that determination, the appellate court must consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record.

"If the reviewing court determines that the district court erred in giving or failing to give a challenged instruction, then the clearly erroneous analysis moves to a reversibility inquiry, wherein the court assesses whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. The party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal." *State v. Williams*, 295 Kan. 506, Syl. ¶¶ 4-5, 286 P.3d 195 (2012).

*Analysis*

The instruction, which was identical to the pre-2005 version of PIK Crim. 3d 52.02, stated, in relevant part:

"If you have a reasonable doubt as to the truth of *any* of the claims required to be proved by the State, you must find the defendants not guilty. If you have no reasonable doubt as to the truth of *any* of the claims required to be proved by the State, you should find the defendants guilty." (Emphasis added.)

*Herbel* considered this same instruction and opined that "[w]hile the older PIK instruction used in Herbel's trial was not the preferred instruction, it was legally appropriate." 296 Kan. at 1124. Subsequently, this ruling has been followed repeatedly. See, *e.g.*, *State v. Holt*, 300 Kan. 985, 1006-07, 336 P.3d 312 (2014); *Miller v. State*, 298 Kan. 921, 936-38, 318 P.3d 155 (2014); *State v. Smyser*, 297 Kan. 199, 206, 299 P.3d 309 (2013); *State v. Waggoner*, 297 Kan. 94, 98-99, 298 P.3d 333 (2013). Warren offers nothing new to compel a different result. Consequently, we hold that the reasonable doubt instruction given in this case was not clearly erroneous and Warren is not entitled to relief.

## CUMULATIVE ERROR

Alternatively, Warren argues that pursuant to the cumulative error doctrine he is entitled to a new trial. Even if an individual error is insufficient to support a reversal, the cumulative effect of multiple errors may be so great as to require the reversal of a defendant's conviction. *State v. Edwards*, 291 Kan. 532, 553, 243 P.3d 683 (2010).

But "[c]umulative error will not be found when the record fails to support the errors raised on appeal by the defendant." *State v. Cofield*, 288 Kan. 367, 378, 203 P.3d 1261 (2009). Even if the defendant establishes a single error, that will not constitute cumulative error. *State v. Foster*, 290 Kan. 696, 726, 233 P.3d 265 (2010). Quite simply, Warren has not established the applicability of the cumulative error doctrine in this appeal.

## SENTENCING ISSUES

Finally, Warren raises three sentencing issues. First, he asks us to vacate his hard 50 life sentence, arguing that K.S.A. 21-4635, the hard 50 statute in effect at the time of his sentencing, is unconstitutional because it denies a defendant his or her Sixth Amendment right to have a jury decide, beyond a reasonable doubt, all of the facts necessary to increase the penalty for first-degree murder. Second, or alternatively, Warren claims that his hard 50 sentence is illegal because the district court failed to provide *written* findings of the statutory aggravating circumstances, as required by K.S.A. 21-4635. Last, Warren argues, and the State concedes, that the district court erred by ordering lifetime post-release supervision, instead of parole. See K.S.A. 22-3717(b); *State v. Clay*, 300 Kan. 401, 418, 329 P.3d 484 (2014) (offenders sentenced for certain off-grid crimes subject to parole, not postrelease supervision).

Because we hold that Warren's sentence was imposed in violation of his constitutional right to a jury trial, and that such error was not harmless, we vacate his hard 50 sentence and remand for resentencing. That holding renders moot the remaining claims of sentencing error. See *State v. Salary*, 301 Kan. 586, 608-09, 343 P.3d 1165 (2015) (declining to address additional sentencing issue as moot, once hard 50 sentence vacated for violating United States Constitution).

### Standard of Review

Determining a statute's constitutionality is a question of law subject to de novo review. *State v. Soto*, 299 Kan. 102, Syl. ¶ 8, 322 P.3d 334 (2014).

## Analysis

At the time of Warren's conviction, K.S.A. 21-4635 set forth a procedure whereby the State could seek enhancement of the minimum sentence for premeditated first-degree murder to 50 years before the convict is parole eligible. As a prerequisite to the enhanced sentence, the State had to prove and the sentencing court had to find the existence of one or more statutorily enumerated aggravating factors. K.S.A. 21-4635. In this case, the district court found that Warren knowingly or purposely killed or created a great risk of death to more than one person, K.S.A. 21-4636(b); that Warren committed the crime for the purpose of receiving money or other things of monetary value, K.S.A. 21-4636(c); and that Warren authorized or used another person to commit the crime, because a third person drove the getaway car, K.S.A. 21-4636(d).

The statutory scheme then required the district court to determine whether there were any mitigating circumstances present, and, if so, whether they outweighed the aggravating factors. K.S.A. 21-4635(d).

At the sentencing hearing, Warren's counsel opposed the hard 50 sentence, arguing that the evidence was too conflicting to establish that Warren knowingly or purposefully killed or created a great risk of death to more than one person; that the evidence did not indicate that Warren was at the house for the purpose of stealing anything or robbing anyone; and that the statutory aggravating circumstance of using another person to commit the crime did not contemplate the use of a getaway driver. Warren's counsel did not argue any mitigating circumstances to weigh against the State's allegation of aggravating circumstances, albeit the district court determined that Warren's young age and his lack of criminal history constituted mitigating circumstances.

Ultimately, the district court imposed a hard 50 life sentence for the premeditated first-degree murder conviction. The court found the existence of each of the aggravating circumstances alleged by the State and determined that the mitigating circumstances did not outweigh the aggravators.

In *Soto*, which was issued after the briefs were filed in this case, we determined that Kansas' hard 50 sentencing statute was uncon-

stitutional pursuant to the United States Supreme Court's ruling in *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151, 2160-63, 186 L. Ed. 2d 314 (2013). *Soto*, 299 Kan. at 124. *Alleyne* held that a person's right to a jury trial under the Sixth Amendment to the United States Constitution requires that any fact increasing a mandatory minimum sentence for a crime must be proved to a jury beyond a reasonable doubt. Given that our hard 50 procedure allowed a judge to find the existence of one or more aggravating factors, instead of requiring a jury to find those factors beyond a reasonable doubt, that procedure was unconstitutional as violative of the Sixth Amendment. *Soto*, 299 Kan. at 124. The same unconstitutional procedure was used in this case, *i.e.*, the sentencing judge, not the jury, made the specific factual findings of aggravating circumstances and did the balancing against mitigating circumstances that resulted in an increased mandatory minimum sentence for Warren.

The State has acknowledged *Soto*'s holding through a Supreme Court 6.09 (2014 Kan. Ct. R. Annot. 52) letter; but it argues that *Soto* "left open the possibility that there could be rare cases where harmless error analysis would allow a Hard 50 sentence to stand." Granted, *Soto* did describe a harmless error test that would require the appellate court to find, beyond a reasonable doubt, that (1) the uncontroverted and overwhelming evidence supported the aggravating circumstance such that the jury would have found the existence of the aggravating circumstance beyond a reasonable doubt; and (2) "that no rational jury would have determined that any mitigating circumstances outweighed any aggravating circumstances." *Soto*, 299 Kan. at 126-27.

Nevertheless, Soto declined to definitively decide whether a hard 50/*Alleyne* error could ever be harmless because even assuming the applicability of a harmlessness analysis, the error in Soto's case did "not come close to meeting that test." 299 Kan. at 126. Specifically, *Soto* opined that even if overwhelming and uncontroverted evidence established the existence of an aggravating factor, this court could not conclude beyond a reasonable doubt, "that no rational jury would have determined that the mitigating circumstance outweighed the aggravating circumstance." 299 Kan. at 127;

see also *State v. Hilt*, 299 Kan. 176, 205, 322 P.3d 367 (2014) (assuming without deciding that harmlessness applies but concluding case did not present "one of the rare instances when a hard 50 *Alleyne* error can be declared harmless"). Likewise, the case before us does not justify our presuming to read the collective mind of a hypothetical jury to find, beyond a reasonable doubt, that it would have determined that mitigating circumstances did not outweigh aggravating factors. In other words, this is not one of the rare cases to which *Soto* alluded.

The State contends that this case is different because Warren failed to present any evidence of mitigating factors at the sentencing hearing, so that no weighing was necessary. But as we noted, the district court engaged in a balancing of the aggravators against the mitigators, which it determined to be Warren's young age and his lack of criminal history. Evidence of those mitigators was contained in the presentence investigation report (PSI), *i.e.*, the record contains evidence of mitigating factors. A jury would have been free to consider those factors as well, and we continue to avoid predicting the result of that consideration.

In conclusion, we hold that the sentencing scheme under which Warren was sentenced was unconstitutional, and we decline to declare that such unconstitutionality was harmless in this case. Warren's hard 50 sentence is vacated, and the matter is remanded for resentencing.

Convictions affirmed, hard 50 life sentence vacated, and case remanded for resentencing.