NOT DESIGNATED FOR PUBLICATION

No. 116,708

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

FREDRICK J. LEMONS JR.,
*Appellant*.


MEMORANDUM OPINION

Appeal from Reno District Court; TIMOTHY J. CHAMBERS, judge. Opinion filed May 18, 2018. Affirmed.

*Sam S. Kepfield*, of Hutchinson, for appellant.

*Thomas R. Stanton*, deputy district attorney, *Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., BUSER and GARDNER, JJ.

PER CURIAM: Fredrick Lemons Jr. appeals his convictions of aggravated kidnapping, aggravated robbery, aggravated burglary, two counts of aggravated battery, and criminal threat related to an early morning home invasion in May 2015. Lemons claims there was insufficient evidence to support his convictions. He also claims the district court erred in denying his motion for new trial. For the reasons stated herein, we affirm the district court's judgment.

1

FACTUAL AND PROCEDURAL BACKGROUND

On the morning of May 14, 2015, at approximately 4 a.m., Brent Rump was awakened in his bedroom by a flashlight shining in his face. He was struck in the face with the butt of a handgun, rolled onto his stomach, and was then hit several more times. He observed three or four men in his bedroom. The men continued to batter Rump while yelling at him not to look at them or he would be killed. The men tied Rump's hands behind his back and then asked him about any drugs, money, or guns in the house. One man stayed with Rump while at least two other men ransacked his house. The men struck Rump several additional times by using one of Rump's own shotguns as well as a baseball bat. The men continuously told Rump they would kill him if he looked at them.

Rump recalled that one man stayed with him while "the other two or three were loading stuff up in either my Jeep or in my car. As far as I know anyway." The intruders located and took two shotguns, televisions, electronics, cash, and credit and debit cards. They demanded Rump give them his personal identification number (PIN) to his debit card and threatened to return and kill him if he gave them the wrong PIN.

After getting the information they wanted, two of the men moved Rump to his basement. While they forced Rump to the basement, the men repeated the threat that they would kill Rump if he looked at them. The men held a gun to Rump's head and neck, so Rump looked only at the floor during this transfer to the basement. Once in the basement, the men tied Rump's feet together and then tied his hands to his feet. The men found the keys and titles to all of Rump's vehicles, and stole two of his vehicles:  a 2007 silver Honda Accord and a burgundy Jeep Grand Cherokee.

Once Rump heard his garage door open and the men drive away, he was able to untie himself and run out of the house for help. A passing car stopped for him and the driver allowed Rump to use his cell phone to call the police. Police were dispatched to

the scene at 4:49 a.m. Rump did not get a good look at the men who came into his home; he reported that their heads and faces were covered with hoodies and blue or black bandannas. Rump described the men to police as having skinny or thin builds. The police immediately began actively looking for Rump's vehicles and issued a "be on the lookout" with the descriptions and license tag numbers for the Honda and the Jeep.

A card transaction history for Rump's bank account on the morning of May 14 reveals that, at 5:05 a.m., someone attempted to withdraw $600 from his bank's drive-up automated teller machine (ATM) at 3rd and Elm Streets in Hutchinson. This amount exceeded the bank's daily limit of $250 for cash withdrawals from the account, and a receipt was issued indicating the requested amount exceeded the withdrawal limit. Nine subsequent transactions were attempted in quick succession over the next seven minutes. These transaction attempts met with various results. Ultimately, a request for $100 was successful. This was followed by another successful request for $100. These transactions were video recorded by a camera at the ATM. The video recording showed a silver car pull up to the ATM. The driver's window rolled down to reveal a person in a white or pale yellow hooded sweatshirt. The hood was over the person's head and the yellow light from above the ATM cast a dark shadow under the hood. Some kind of covering over the lower half of the person's face was visible, but the rest of the face was completely dark. Rump later viewed the video but could not identify the person making the transactions.

*Police investigation leads to Lemons' arrest*

Approximately 30 minutes before the police were dispatched to Rump's residence, Brittney Larrick woke up in her bedroom at her house on West 6th Avenue in Hutchinson to find that her boyfriend, Dakota Andersen, was not there. She called his cell phone at approximately 4:20 a.m., but he did not answer. She woke up again at approximately 4:45 a.m. to find he had returned. Larrick and Andersen began to argue, and Andersen left the house again around 5:30 a.m. At approximately 6 a.m., Larrick was again awakened to

3

find Andersen and Lemons in her bedroom. Larrick went back to sleep and woke up at approximately 9:15 to get ready for work. At this time, both Andersen and Lemons were asleep on her bed. Larrick noticed a white hooded sweatshirt on her kitchen counter that she did not recall seeing there when she got up earlier that morning.

Later that morning, Ashley Reed Wilson, a former girlfriend of Lemons', picked him up at Larrick's residence to take him to a doctor's appointment. Lemons was wearing a white hooded sweatshirt and jeans. When the appointment was over, Wilson returned Lemons to the house.

Also that morning, Detective Jamie Schoenhoff of the Hutchinson Police Department located Rump's Jeep and Honda in the parking lot of the Royal Apartments in the 300 block of East 1st Avenue. The vehicles were parked a few spaces apart among the other vehicles in the lot. Schoenhoff communicated his discovery to other law enforcement officers involved with the investigation, and the officers set up surveillance within several blocks around the parking lot. Schoenhoff positioned himself so that he could observe both of Rump's vehicles as well as the traffic coming and going.

At approximately 1:50 p.m., a woman driving a red Dodge pickup truck approached the apartment parking lot under surveillance from the wrong direction, which attracted Schoenhoff's attention. The truck pulled into the parking lot, and "a black male hopped out of the passenger side of that vehicle and immediately jumped into the . . . silver Honda Accord." The man who got out of the truck and into the Honda was later identified as Lemons. Lemons drove straight towards Schoenhoff as he exited the parking lot. Schoenhoff informed the other officers by radio of the development and he then began to follow Lemons in the Honda. Several detectives took turns following the Honda so as to not alert Lemons of their presence.

4

Near the intersection of 7th and Main, Lieutenant Robertson and Detective Bryan Rodriguez were in front of the Honda while Detective Sergeant Tyson Meyers was behind it. Robertson and Rodriguez decided to block the Honda between the law enforcement vehicles and activated their emergency lights. Robertson and Rodriguez got out of their vehicle and approached the Honda with their weapons drawn, repeatedly ordering Lemons out of the Honda. Lemons threw the car into reverse and "rammed" into Meyers' vehicle at approximately 20 miles per hour. The impact disabled Meyers' vehicle. Lemons immediately put his hands up. As Robertson and Rodriguez approached the Honda, and as Meyers attempted to get out of his vehicle, Lemons then "threw [the Honda] back in drive" and "fled at a very high rate of speed."

At this point, multiple marked police vehicles also began to pursue Lemons. Lemons turned towards Schoenhoff's vehicle on 6th Avenue but then drove down an alley. Schoenhoff followed Lemons and saw him slide to a stop in the dirt of the alley. Lemons exited the Honda and ran back towards Schoenhoff; Lemons then turned into a yard next to Schoenhoff, running into the back door of 312 West 6th Avenue. Schoenhoff saw other officers run into the house behind Lemons. The woman in the red pickup who had dropped Lemons off at the Honda was parked behind this house. Police located Lemons in the house, sprawled out on the living room floor; he said he was unarmed and "giving himself up." Lemons was then taken into custody.

That afternoon, police obtained a search warrant for the home of Larrick and Andersen, where Lemons also was staying. Police found a partially burned title for a vehicle belonging to Rump in a barbeque grill. They also found a set of house keys belonging to Rump in the kitchen trash can. Approximately 3 to 5 feet from the trash can, police found a white hooded sweatshirt on the kitchen counter. The sweatshirt caught the officers' attention because of the images from the ATM video recording from earlier that morning. Police also searched Larrick's vehicle and found an ATM receipt reflecting "funds not available" from one of the transactions that morning.

5

The next morning, Lemons called Larrick from jail. At the beginning of the call, a recording reported that the call would be monitored or recorded. In the recording of that call, Larrick is heard demanding that Lemons tell her what happened the day before. Lemons denied involvement in any crimes. Larrick, however, complained to Lemons, in detail, that she knew he "wrecked the cop car," that her house was raided, and that the police found evidence such as the ATM receipt in her car and other items in the house such as the burned car title, keys, and a white sweatshirt. Lemons asked about Andersen, and Larrick informed him that Andersen "is long gone." At that point, Lemons got Andersen's phone number from Larrick and then ended the call.

Lemons then immediately called Andersen, who was "on the run" from police. Lemons and Andersen discussed the events from the previous day in varying detail while intermittently denying involvement to each other. Lemons told Andersen that the police "found everything," such as the burned title and the keys, and he then told Andersen to call the police and tell them he was not involved in the crimes.

The police ultimately towed Rump's Jeep back to his house, but the keys were not returned. Rump also got his Honda back but in a substantially damaged condition. Rump noticed items in the Honda that were not his, such as a Texas baseball cap. Rump called the police and asked them to retrieve the cap.

The State charged Lemons with numerous crimes, including aggravated kidnapping, aggravated robbery, aggravated burglary, two counts of aggravated battery, and criminal threat. At trial, the State called numerous witnesses who presented the above-described evidence to the jury. The State also presented forensic analysis of the white hooded sweatshirt that yielded DNA from two individuals. One contributor was not substantial enough to develop a profile. The other contributor was a probable match to Lemons. The Texas ball cap yielded three profiles, two of which were smaller unknown contributors, but the larger contributor profile was consistent with Lemons.

6

Lemons did not testify at the trial. However, Jordan Leffel, a friend of Lemons' since childhood, testified that Lemons was not involved in the home invasion or other crimes involving Rump. Leffel testified that he committed the crimes, along with Andersen and Brendan Jones. On cross-examination, Leffel acknowledged that he was convicted prior to Lemons' trial for being involved with the Rump home invasion and sentenced to over 19 years in prison. Leffel also admitted sending messages to his mother the evening before Lemons' trial was to begin, asking for her assistance in convincing some of Lemons' girlfriends to put $100 on his "books" in prison in exchange for his testimony. However, Leffel testified that no one ever gave him any money and he decided to testify anyway because it was the right thing to do.

After deliberations, the jury found Lemons guilty as charged. On April 22, 2016, the district court sentenced Lemons to a controlling term of 272 months in prison. Lemons filed a timely notice of appeal.

SUFFICIENCY OF THE EVIDENCE

Lemons appeals his convictions of aggravated kidnapping, aggravated robbery, aggravated burglary, aggravated battery, and criminal threat. Lemons concedes the crimes occurred but contends the State's circumstantial evidence was insufficient to link him to the crimes related to the home invasion and argues that he was not a participant in those crimes. The State argues that the evidence was sufficient for a reasonable fact-finder to find Lemons was guilty of those crimes beyond a reasonable doubt.

"'When the sufficiency of the evidence is challenged in a criminal case, this court reviews the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' [Citation omitted.]" *State v. Rosa*, 304 Kan. 429, 432-33, 371 P.3d 915 (2016). "In making a sufficiency determination, the appellate court does not reweigh evidence, resolve

7

evidentiary conflicts, or make determinations regarding witness credibility. [Citations omitted.]'" *State v. Dunn*, 304 Kan. 773, 822, 375 P.3d 332 (2016).

The key issue at Lemons' trial was identification. On appeal, Lemons points out that Rump could not identify the men who broke into his home. He contends that the State's case against him was entirely circumstantial. However, a verdict may be supported by circumstantial evidence, if such evidence provides a basis for a reasonable inference by the fact-finder regarding the fact in issue. Circumstantial evidence, in order to be sufficient, need not exclude every other reasonable conclusion. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016). A conviction of even the gravest offense can be based entirely on circumstantial evidence. 304 Kan. at 25.

There is no question that Andersen was involved in the invasion of Rump's home. Andersen was not at home and did not answer his phone at 4:20 a.m., during the time of the robbery. Leffel testified that Andersen was one of the men involved with him in the robbery, which lasted from approximately 4 to 4:30 a.m. Rump was able to free himself after the robbers left and call the police, who were dispatched at 4:49 a.m. Significantly, Andersen arrived back at his home at about 4:45 a.m. and had an argument with Larrick.

However, substantial evidence also connects Lemons to the home invasion. A person in Rump's silver Honda, wearing a white hooded sweatshirt, attempted to make ATM transactions with Rump's debit card immediately after the robbery. Later that morning, Larrick observed a white hooded sweatshirt on her kitchen counter when she got ready for work a few hours later, which she confirmed was not there earlier in the morning before Lemons arrived at her residence. Still later in the morning, Lemons was wearing a white hooded sweatshirt when he was picked up from Andersen and Larrick's house for a doctor's appointment.

More importantly, at 1:50 p.m., Lemons was observed entering Rump's silver Honda and driving out of the parking lot. When police attempted to stop the vehicle, Lemons attempted to flee, showing a consciousness of guilt. When the police ultimately caught up with Lemons, he indicated that he was "giving himself up."

In a subsequent search of Larrick's residence, where Lemons was staying, the police found a partially burned title for a vehicle belonging to Rump. They also found a set of house keys belonging to Rump in the kitchen trash can. Approximately 3 to 5 feet from the trash can, police found a white hooded sweatshirt on the kitchen counter. Police also searched Larrick's vehicle and found an ATM receipt reflecting "funds not available" from one of the transactions that morning.

The State also presented evidence of Lemons' phone calls with Larrick and Andersen the day after the home invasion. Although Lemons denied involvement in the robbery during the phone calls, he discussed the events surrounding the robbery in detail and also made a number of suspicious statements indicating that he may have been connected with Andersen in the home invasion. Finally, forensic evidence connected Lemons to the crimes. Forensic analysis of the white hooded sweatshirt yielded DNA with a probable match to Lemons. Lemons' DNA profile also was found on the Texas ball cap that was later discovered in Rump's silver Honda.

Recent possession of stolen property is well established as a sufficient basis to support convictions for burglary and theft when no satisfactory explanation exists for the person's possession of such property. *State v. McFall*, 219 Kan. 798, 799, 549 P.2d 559 (1976). Here, the State presented no direct evidence placing Lemons at the scene of the home invasion. However, the State presented evidence establishing that Lemons was the person in the white hooded sweatshirt who was attempting to make ATM transactions with Rump's debit card immediately after the robbery. The State presented other evidence connecting Lemons with the home invasion, including the fact that he was found getting

9

into Rump's silver Honda soon after the robbery, his flight from the police officers, the discovery of Rump's stolen property in Larrick's residence where Lemons was staying, Lemons' suspicious statements made during the recorded phone calls, and the forensic evidence connecting Lemons to the white hooded sweatshirt and the Texas ball cap found in Rump's silver Honda. This circumstantial evidence provided a reasonable inference for the jury to conclude that Lemons participated in the home invasion.

Lemons' argument on appeal amounts to a request for this court to reweigh the evidence presented at trial. However, an appellate court does not reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility. *Dunn*, 304 Kan. at 822. Based on the evidence presented at trial, when viewed in the light most favorable to the State, it was reasonable for the jury to find that Lemons was present and participated in the home invasion of Rump. Thus, we conclude there was sufficient evidence to support the convictions.

MOTION FOR NEW TRIAL

Lemons also claims the district court erred in denying his motion for new trial. Specifically, Lemons argues that his trial counsel received newly discovered evidence after the trial of screenshots of Facebook messages between him and a girlfriend. He claims this evidence would have corroborated Leffel's testimony that he was not involved in the home invasion on the morning of May 14, 2015. The State asserts that the district court did not err in denying Lemons' motion for a new trial under the facts of this case.

"The court on motion of a defendant may grant a new trial to the defendant if required in the interest of justice." K.S.A. 2017 Supp. 22-3501(1). However, granting a new trial due to newly discovered evidence is not favored and a motion to do so should be viewed with great caution. *State v. Thomas*, 257 Kan. 228, 233, 891 P.2d 417 (1995).

10

An appellate court reviews the district court's decision denying a motion for new trial for an abuse of discretion. *State v. Warren*, 302 Kan. 601, 614, 356 P.3d 396 (2015). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the district court; (2) the action is based on an error of law; or (3) the action is based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015). The party asserting the district court abused its discretion bears the burden of showing such abuse of discretion. *State v. Robinson*, 303 Kan. 11, 90, 363 P.3d 875 (2015), *cert. denied* 137 S. Ct. 164 (2016).

To establish the right to a new trial based upon newly discovered evidence, a criminal defendant must establish:  (1) that the newly proffered evidence could not have been produced at trial with reasonable diligence; and (2) that the newly discovered evidence is of such materiality that it would be likely to produce a different result upon retrial. *Warren*, 302 Kan. at 615. In determining whether new evidence is material, the district judge must assess the credibility of the newly proffered evidence. The appellate court will not reassess the district court's determination of credibility. 302 Kan. at 615-16.

Here, the district court found that the proffered evidence was neither newly discovered nor material. The Facebook messages at issue were not presented as evidence in district court at the hearing on the motion for new trial. Thus, it is understandable for the district court to find that Lemons failed to show the evidence would have changed the result of the trial. Also, the Facebook messages are not part of the record on appeal. The party claiming an error occurred has the burden of designating a record that affirmatively shows prejudicial error. Without such a record, an appellate court presumes the action of the district court was proper. *State v. Sisson*, 302 Kan. 123, 128, 351 P.3d 1235 (2015).

More importantly, the record on appeal reflects that the defense was aware of the Facebook messages prior to trial. Lemons' trial counsel indicated that he requested the messages "many times" from the girlfriend but did not receive them in time to use the

evidence at trial. In light of this admission, the district court found that Lemons was aware of the messages before trial. Because the messages were purportedly exchanged between Lemons and his girlfriend, the district court found that Lemons would have been aware of the evidence and should have been able to produce it at trial. Thus, the district court concluded that the evidence was not, in fact, newly discovered.

On appeal, Lemons acknowledges the district court's finding that the Facebook messages did not qualify as newly discovered evidence. However, Lemons does not explain why the evidence could not have been produced at trial with reasonable diligence. Instead, Lemons only contends that the evidence was material and would have likely resulted in a different verdict given the "relative weakness" of the State's case.

Lemons has failed to establish that the Facebook messages were newly discovered, that they could not have been produced at trial with reasonable diligence, and that their admission into evidence would produce a different result upon retrial. Lemons does not claim that the district court made an error of law or fact in its findings regarding the purported newly discovered evidence. Under the circumstances, it cannot be said that no reasonable person would take the view adopted by the district court. Thus, Lemons has failed to show that the district abused its discretion in denying his motion for a new trial.

Affirmed.