NOT DESIGNATED FOR PUBLICATION

No. 118,641

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

SAMUEL DOMINGO LLAMAS,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Lyon District Court; JEFFRY J. LARSON, judge. Opinion filed November 16, 2018. Affirmed in part and dismissed in part.

*Paul E Dean*, of Patton Putnam & Dean LLC, of Emporia, for appellant.

*Amy L. Aranda*, first assistant county attorney, *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., PIERRON and POWELL, JJ.

PER CURIAM: Serving a life sentence without the possibility of parole for 20 years for aiding and abetting felony murder, Samuel Domingo Lamas appeals the denial of habeas corpus relief he had sought in his K.S.A. 60-1507 motion in district court. After a preliminary hearing, the Lyon County District Court dismissed some of his issues because they had been resolved on direct appeal or waived. After an evidentiary hearing on the remaining issues, the district court denied Llamas' motion. From our review of the record, the court's findings of fact sufficiently supported its conclusion that Llamas' trial

1

attorney was effective. And we find no abuse of discretion in the court denying his motion for a new trial. We affirm.

*This was a murder in the drug trade.*

In Emporia, during September 2009, Michael Ismael Navarro shot and killed Omar Flores. Flores had not paid Navarro for some drugs he had sold him. Llamas was convicted of aiding and abetting the murder. The facts of the crime can be found in *State v. Llamas*, 298 Kan. 246, 248-52, 311 P.3d 399 (2013). We will summarize them here.

After Navarro learned of Flores' location, he got a semi-automatic .22 caliber rifle and left his house driving a silver Honda Civic. Navarro picked up Llamas and drove to Flores' location. Navarro spotted Flores and then followed Flores, who was driving a white Suburban, to a motel. Llamas told a friend that Navarro then got out of the car with the rifle, confronted Flores, and when Flores tried to grab the rifle, Navarro began shooting Flores, "unleashing" on him. Llamas told his friend he began walking to a gas station where Navarro then drove and met him. The two men then got something to drink. Llamas told his friend that he knew Navarro had a rifle in the car.

The motel owner saw two men standing outside the vehicles get into the Honda. The man closer to the driver's door of the Suburban got in the front passenger seat of the Honda, and the other man got into the driver's seat of the Honda.

A surveillance tape from inside a convenience store near the motel showed the view from several angles. The footage included a time stamp, which showed that about two minutes after the 911 call reporting shots being fired at the motel, Navarro and Llamas walked "casually" to the door of the store while Llamas used his cell phone. The cameras showed Navarro and Llamas walking into the store together and moving to the back of the store near the coolers. About a minute later, Navarro walked to the front of

the store, looked out the door, and then returned to the coolers. Then, both Navarro and Llamas returned to the front of the store with drinks, which Llamas purchased with cash. Navarro left the store, but Llamas remained and played a video game for several minutes.

Llamas made inconsistent statements to law enforcement officers, claiming he knew about the shooting from the news. Then, after being confronted with the surveillance evidence from the convenience store, he admitted he was with Navarro at the time of the shooting, but claimed he did not know what Navarro was going to do. Llamas said he got out of the car and ran when Navarro began shooting Flores. He claimed Navarro caught up with him in the Honda and threatened him to not tell anyone or the same thing would happen to him. Llamas said he kept walking and Navarro then met up with him at the gas station.

Emergency personnel found Flores in the driver's seat of the Suburban, slumped over the center console. Flores had been shot 11 times with a .22 caliber gun in the head, torso, and arm.

Cell phone records established that Llamas called his uncle when he and Navarro were approaching the convenience store. Llamas' uncle testified that Llamas asked him for a ride. The cell phone records also established that Llamas called Navarro's girlfriend less than 50 minutes after the 911 call was logged. Several days later, Llamas called Navarro in Mexico, where Navarro had gone just days after the shooting.

Llamas appealed. The Supreme Court affirmed his convictions. It held:
- The evidence was sufficient to support the jury's verdict because there was evidence that Llamas took an active role in the commission of the crimes and intended to aid and abet Navarro;
- the trial court did not err in failing to add Llamas' proposed "'mere association or presence'" language to the aiding and abetting jury

3

instruction (although the better practice would have been to add the language); and

- any error in failing to instruct the jury to consider the testimony of Navarro's girlfriend with caution because she was an accomplice was harmless. 298 Kan. at 248.

While this was going on, the State tracked down Navarro in Mexico and extradited him back to Kansas in July 2012. He eventually pled guilty to a single charge of felony murder in exchange for the dismissal of other charges against him. Navarro also conditioned his plea on the State's agreement to not prosecute his girlfriend or another friend for their parts in helping him flee to Mexico and destroying evidence after the shooting in September 2009. At his plea hearing, Navarro confirmed that he told his attorney all the facts he knew about the case, withheld no information, and provided no false information. At his sentencing hearing, Navarro chose not to make a statement.

*We recount the habeas corpus procedure in district court.*

In Llamas' motion for relief under K.S.A. 60-1507, he complained of prosecutorial misconduct, ineffective assistance of counsel, and abuse of discretion by the trial court. He claimed that the evidence introduced at his trial did not support the crimes charged, his attorney did not represent his interests, and the evidence introduced at trial did not support his sentence. Llamas claimed that these issues could not have been raised on direct appeal. The court appointed an attorney to represent Llamas.

In a pro se memorandum, Llamas raised three additional issues. First, he alleged prosecutorial misconduct for introducing false evidence at trial and the State had received evidence that established he did "walk/run" away from the crime scene, which it withheld from the jury. Second, Llamas claimed that his attorney did not represent his interests when he failed to locate a nearby car dealership video that showed he "walked/ran" from

4

the scene. Finally, Llamas claimed that the trial court abused its discretion because the "principle [*sic*] defendant" stated in court that Llamas—as movant—was "not involved in the actions on the night in question."

Llamas stated that he tried to secure "copies of principle [*sic*] defendant's trial transcripts to establish this material fact." Llamas also argued that some portions of witnesses' trial testimony was refutable, and some witnesses should have been identified as accomplice witnesses. He also claimed that the district court abused its discretion by finding there was probable cause, and his trial attorney was ineffective when he did not challenge the district court's probable cause determination before trial.

Later, the court dismissed Llamas' ineffective assistance of counsel claims of failure to designate a State's witness as an accomplice witness and failure to effectively cross-examine a witness because those claims were addressed in his direct appeal. The district court also dismissed Llamas' claim that the district court abused its discretion it its probable cause finding because Llamas waived that issue.

The court did, however, seek evidence on two points. The court set an evidentiary hearing on whether trial counsel was ineffective for failing to admit into evidence the footage from the car dealership and whether Navarro's statements, obtained postextradition, were newly discovered evidence justifying a new trial. The district court specifically wanted information on whether the time stamps in the dealership footage were consistent with the time line established by the evidence admitted at trial. The district court also wanted to observe Navarro's demeanor and determine his veracity under cross-examination.

We look first at the car dealership video question.

5

Llamas called his trial attorney, Mark Manna, to testify. Manna testified that their theory of the case was Llamas was merely a witness and he did not assist Navarro in the killing of Flores. The defense strategy in dealing with the motel owner's testimony was to distance Llamas from Navarro's actions. In the footage from the convenience store, all the angles showed Navarro and Llamas arriving together. The defense was concerned about the convenience store footage for this reason. This was a problem for the defense.

> "And to be frankly honest, my, my main concern was with when he got to the convenience store showing up there with Mr. Navarro. So, our concern wasn't so much on how he got to the store, but the fact that he got to the store at the same time as Mr. Navarro and then we saw another split off[.]"

Manna recalled watching the footage from the car dealership early in the case, but he saw nothing relevant to the case. He stated, "I think the other video . . . I don't recall it having much evidentiary value of seeing anything in it that I, I thought was useful at the time." At the hearing they began watching at the time stamp 8:10:28 because the 911 call was placed at 8:11. At the 8:25-mark Manna could see "very faintly" the outline of a person moving right to left, which corresponded west to east, for a couple of seconds.

Manna suggested it looked like a shadow moving at 8:25:25 and again at 8:25:30. Manna had not noticed the figure until the habeas corpus attorney pointed it out to him. Manna indicated it was possible this could have supported the defense theory that Llamas left the scene and waked toward the convenience store. Manna acknowledged that the identity of the figure was unknown. He testified that he still would have had to contend with Navarro and Llamas meeting up at the convenience store.

Manna suggested the dealership footage could have assisted the defense. "[T]here would be some value. How much value, I don't know. But in retrospect, having seen that

6

image today, I don't see a downside to presenting it and I see a possibility that it might have advanced the defense theory and helped the case."

Manna explained he had given the footage little consideration at the time because it was an hour-and-a-half long, so he only watched it a couple of times. Neither he, nor his cocounsel, nor their investigator, saw the image, and none of them saw the evidentiary value of the footage.

Manna acknowledged the gap in time from the 911 call at 8:11 and the unidentified image in the dealership footage at 8:25. He had no reason to believe the convenience store footage did not have accurate time stamps. Manna conveyed that if anything had been questionable about the convenience store time stamps, he would have raised that at trial. He recalled there was no dispute about the time frame of events at trial.

He remembered that the timing of Llamas and Navarro entering the store was within two to three minutes of the shooting. Manna revealed that the inconsistent timing was a problem that would have been weighed and factored in, but he probably would have played it and let the jury reconcile the inconsistent time frame. Manna noted that the State would have pointed out the inconsistency to the jury. Manna assumed that if the dealership footage was used, time would have become a "fairly major issue."

The timing of these events was the subject of the investigator here. The lead investigator on the case testified that the 911 call was placed at 8:11:26. Call logs show that officers reported at 8:14 and an ambulance arrived at 8:17. The investigator reviewed the convenience store tapes and time stamps. Navarro and Llamas arrived at 8:13:35, and by 8:14:50 one could see two to three patrol cars go by on the road, driving east to west with lights on. The two men walked in "nonchalantly," and Llamas held the door for Navarro. They were at the register with their drinks when the first patrol cars go by.

7

Llamas left at 8:21:06 and walked east. The investigator testified that the convenience store footage, the car dealership footage, and the call logs showed no substantial discrepancies. There was an approximate two-minute difference between the dealership footage and the call logs.

We summarize Navarro's testimony.

Navarro testified at the 60-1507 hearing that he asked Llamas to accompany him on a task, but he did not tell him what the task was. He claimed that Llamas did not know what he was going to do, and he was only a passenger in the vehicle. Navarro denied knowing whether Llamas was consuming alcohol that day. Navarro also said that he picked up Llamas to just drive around.

Navarro said that Llamas did not know why he wanted to talk to Flores and he did not know that Navarro was following Flores. Navarro testified that he had the gun with him because he was looking for Flores and he thought there was the potential for a problem.

Navarro said that Llamas was already out of the car by the time he got out, "I believe he might have gotten scared and he left." Navarro testified he talked with Flores, but Flores became aggressive and they started to argue. He testified that he did not have the gun when he got out of the vehicle first, but after arguing with Flores, he went back to get it. He said he tried to hide the meter-long gun from Flores. He testified that Llamas was gone when he went back for the gun. He also said, "But [Llamas], he got out of the car and was far. He wasn't close." Navarro testified that Llamas left before he was arguing with Flores and also when he was arguing with Flores. During the altercation in front of Flores' vehicle, Navarro said he did not see Llamas. He also testified he did not see Llamas leave the parking lot while he was arguing with Flores. But Navarro claimed he saw that Llamas had crossed the street to the gas station.

8

After the shooting, Navarro testified, "I went home. I saw a gas station and I found [Llamas] there and then I just left him there." Navarro also testified that he "went to try to pick [Llamas] up and told him I was sorry; I didn't know that was going to happen." Navarro said that Llamas told him to leave.

Navarro spoke with Llamas a day or two after Flores' murder and told him he was going to Mexico. Navarro testified that he was in Mexico in 2009 and 2010 during Llamas' trial. He was "partly" trying to keep his whereabouts hidden.

The court weighed this evidence with other evidence it heard. When the lead investigator spoke with Llamas in September 2009, Llamas said that he knew Navarro had been following Flores for 5 to 10 minutes, he was present when Navarro shot Flores, and then he ran to the gas station. Navarro walked up to him and they went into the store together.

Llamas said he called his cousin to pick him up at Arby's 2 1/2 blocks east of the convenience store. A sergeant with the Emporia Police assigned to the case testified that the convenience store footage and Llamas' cell phone time stamps were correct and in sync. Llamas knew they were following Flores and there was a problem between the men. Llamas believed Flores owed Navarro money. Llamas said he heard shots and ran. Later, he said he also saw Navarro and Flores arguing.

Navarro's attorney testified that Navarro told him at their first meeting in August 2012 that he planned everything and Llamas was not at fault. Navarro told him that Llamas was drunk that day and did not know anything. He said that Navarro prepared no statement of what occurred.

In its memorandum, the district court found that trial attorney Manna was not ineffective for choosing to not admit the car dealership surveillance video into evidence

9

at Llamas' trial. The district court also determined that Navarro's statement was not newly discovered evidence, but newly available evidence, which justified no new trial. The district court found that even if Navarro's statement was newly discovered evidence, it was unlikely to affect the jury's verdict because Navarro was not a credible witness. Based on these findings, the district court denied Llamas a new trial.

*We look first at the three issues the court dismissed without first taking evidence on them.*

Llamas contended in his 60-1507 motion that his trial counsel, Manna, was ineffective on cross-examination about some blood spatter evidence. He also claimed that Manna was ineffective for failing to have one of the State's witnesses designated as an accomplice witness. And Llamas argued that the district court abused its discretion by making improper inferences at his preliminary hearing in finding there was probable cause to bind him over for trial. The court dismissed these three outright, without first hearing any evidence about them.

In his brief, Llamas concedes that each one was appropriately dismissed. Trial counsel sufficiently questioned the blood evidence and he could not cite a case that supports Llamas' claim. He admitted that the accomplice witness issue was raised and decided in Llamas' direct appeal. And he stated that he could not dispute that Llamas' failure to attack the sufficiency of a preliminary examination constitutes a waiver of that claim.

The rule on this is direct and clear. An issue not briefed by the appellant is deemed waived or abandoned. *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011). We deem these three issues abandoned and dismiss that portion of the appeal.

10

*We repeat the rules that we must follow.*

After a full evidentiary hearing on a K.S.A. 60-1507 motion, the district court must issue findings of fact and conclusions of law on all issues presented. See Supreme Court Rule 183(j) (2018 Kan. S. Ct. R. 223). An appellate court reviews the court's findings of fact to determine whether they are supported by substantial competent evidence and are enough to support the court's conclusions of law. Appellate review of the district court's ultimate conclusions of law is de novo. *State v. Adams*, 297 Kan. 665, 669, 304 P.3d 311 (2013). Whether the district court's findings of fact and conclusions of law comply with Rule 183(j) is a question of law that is reviewed de novo. *Robertson v. State*, 288 Kan. 217, 232, 201 P.3d 691 (2009).

To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish (1) that the performance of defense counsel was deficient under all the circumstances, and (2) prejudice—that there is a reasonable probability the jury would have reached a different result in the absence of the deficient performance. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014).

Judicial scrutiny of counsel's performance on a claim of ineffective assistance of counsel is highly deferential and requires consideration of all the evidence before the judge or jury. The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). To establish prejudice, the defendant must show a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different, with a reasonable probability meaning a probability sufficient to undermine confidence in the outcome. *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015).

11

*We apply those rules here.*

Llamas did not meet his burden to show that his trial attorney, Manna, was ineffective. He does not challenge the factual findings of the district court. Instead, he argues that the significance of the convenience store footage was not "proven with overwhelming evidence" to "negate the prejudice" of Manna's failure to admit the car dealership video. We take this to mean the convenience store video is not so overwhelming that it renders the car dealership video meaningless. We are unpersuaded by this confusing argument.

The dealership footage is not part of the record on appeal. We only know the substance of the footage based on the testimony and proffered descriptions of those who have seen it. The burden is on the party making a claim to designate facts in the record to support that claim; without such a record, the claim of error fails. *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644-45, 294 P.3d 287 (2013). If this video was so compelling, why is it that Llamas has not made it a part of this record?

Even so, Llamas contends he met his burden. He argues that Manna's admissions at the hearing sustain his burden on appeal because Manna did not present "potentially exculpatory evidence because his viewing of the video was insufficiently [thorough]." Llamas contends he also met his burden to show prejudice because he was denied the opportunity to provide the jury "a certain level of unbiased evidence to [corroborate] his claims" of running away from the scene and to attack the credibility of the motel owner. We are not so persuaded based on this record.

The district court found that the time stamps in the video did not support Llamas' theory that the unidentified individual walking in front of the dealership at 8:25 p.m. could be him and thus bolster his claim that he ran from the scene when the shooting began. The time line established by law enforcement call logs and the convenience store

surveillance footage support the conclusion that Llamas left the convenience store at 8:21 p.m., walking east of the dealership. Llamas offered no evidence or explanation to account for being captured on the west side of the dealership, also walking east in the direction of the convenience store three minutes after he left that same store.

We note with interest that Manna explained he gave the dealership footage little consideration at the time of Llamas' trial because he saw no evidentiary value in it. The footage was an hour-and-a-half long and he only watched it a couple of times. Likewise, his cocounsel and their investigator also saw the footage, and none of them saw the faint shadow of an image in the corner of the screen at 8:25:25 and again at 8:25:30.

While Manna did acknowledge in retrospect that admitting the footage would have unlikely harmed his case, he believed it would be an issue of what weight the jury would have given the video and he still would have had to address the convenience store footage of Navarro and Llamas arriving together in the context of the time line. Based on these facts and given the strong presumption that Manna's conduct fell within the broad range of reasonable professional assistance, Llamas failed to show that Manna was deficient under all the circumstances.

Next, we turn to the district court's conclusion that Llamas was not prejudiced by Manna's decision to not admit the dealership footage. In other words, even if Manna was deficient, Llamas failed to prove he was prejudiced. The hearing testimony of law enforcement officers showed the time stamps on the dealership footage were about two minutes faster than those consistent time stamps on the convenience store footage, Llamas' cell phone, and the law enforcement call logs. The dealership's footage showed an unidentifiable faint shadow that appeared west of the dealership at 8:25, which compared to the other sources as 8:23. Since Llamas left the convenience store at 8:21, that gave him only two minutes to run west, beyond the dealership, and then turn back

13

walking east to be captured on the footage at that time and in that place. But the footage shows that Llamas left the store at 8:21 walking east toward Arby's to meet his ride.

Llamas failed to show a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. The dealership footage was not reasonably sufficient to undermine confidence in the outcome. The district court's conclusions were supported by substantial competent evidence. The district court is affirmed on this point.

*The court properly denied the motion for a new trial.*

Llamas contends that the district court abused its discretion when it denied his request for a new trial based on newly discovered evidence, i.e., Navarro's statements. The State argues that the district court should be affirmed because Navarro's statements were not newly discovered evidence and they were not material to the proceedings.

The district court found that Navarro's statements were not newly discovered evidence, but newly available evidence, which justified no new trial. The district court found that Llamas presented only minimal evidence that he acted to secure Navarro's testimony for trial, and he did not seek to continue his trial when Navarro was unavailable. And Navarro was not credible because of inconsistencies between his testimony and the law enforcement officers' testimony who tried to interview him, his demeanor and the manner in which he testified, and his statements were contradicted by Llamas' own statements following the shooting.

It is within the discretion of the trial court to grant or deny a new trial under K.S.A. 2017 Supp. 60-259(a). A ruling on a motion for a new trial will not be disturbed on appeal except upon a showing of abuse of discretion. *Miller v. Johnson*, 295 Kan. 636, 684-85, 289 P.3d 1098 (2012).

14

To establish the right to a new trial based on newly discovered evidence, a criminal defendant must establish: (1) that the newly proffered evidence could not have been produced at trial with reasonable diligence; and (2) that the newly discovered evidence is of such materiality that it would be likely to produce a different result upon retrial. In determining whether new evidence is material, the district judge must assess the credibility of the newly proffered evidence. The appellate court will not reassess the district judge's determination of credibility from such a hearing. *State v. Warren*, 302 Kan. 601, 615-16, 356 P.3d 396 (2015).

A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015). An abuse of discretion occurs if discretion is guided by an erroneous legal conclusion or goes outside the framework of or fails to consider proper statutory limitations or legal standards. See *Matson v. Kansas Dept. of Corrections*, 301 Kan. 654, 656, 346 P.3d 327 (2015). The party asserting the trial court abused its discretion bears the burden of showing such abuse of discretion. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106, *cert. denied* 571 U.S. 826 (2013). Here, Llamas does not claim that the district court made an error of law or fact in denying his motion for a new trial. He contends that the district court was unreasonable in denying his motion.

The record reveals that Navarro fled to Mexico within days of the shooting. He remained there for nearly three years while maintaining contact with his girlfriend in Emporia. It was, in part, through this connection that law enforcement located Navarro and extradited him back to Kansas. Navarro knew that Llamas was convicted of felony murder. He wrote no letters or statements on Llamas' behalf. Even after his return to Kansas in July 2012, he did not speak to law enforcement about Llamas. Throughout Navarro's criminal proceedings in 2012, he did not mention Llamas, but he sought to

15

ensure his girlfriend and another friend would not be prosecuted in exchange for his plea. Navarro provided no statement for Llamas until February 2017, more than two years after Llamas filed his K.S.A. 60-1507 motion, and more than four years into his own sentence for felony murder. The district court's conclusion that Navarro's statement and testimony was not newly discovered evidence is reasonable.

The more important question that has not yet been answered is how would Navarro's testimony been obtained to help Llamas at his trial? Llamas fails to acknowledge that even if Navarro had not fled to Mexico but had stayed in Emporia, he still would not have been able to compel Navarro's testimony. The State had pending criminal charges against Navarro. The trial attorney, Manna, acknowledged this reality on the stand at Llamas' 60-1507 hearing. He suggested certain retrospective hypothetical scenarios that might have allowed Navarro to testify, such as Navarro voluntarily waiving his right against self-incrimination, and concluded that it was all speculation. Fundamentally, however, statements of a codefendant who was known to a defendant, but unavailable at the time of trial, are not "newly discovered" evidence. *State v. Redford*, 248 Kan. 130, 133-35, 804 P.2d 983 (1991).

Significantly, the district court determined that Navarro was not credible, and so his statements—even if newly discovered—were not material and would not produce a different result at trial. While the appellate court will not reassess a district judge's determination of credibility under these circumstances, we do note that the record reflects Navarro's testimony is replete with contradictions, both with the evidence established at trial and even within his own testimony at the K.S.A. 60-1507 hearing. See *Warren*, 302 Kan. at 615-16.

With this record, it was reasonable for the district court to find that Navarro's statements were not newly discovered evidence and they would not affect a new trial's

16

outcome. We find the district court did not abuse its discretion in denying Llamas' request for a new trial. The district court is affirmed.

Affirmed in part and dismissed in part.