NOT DESIGNATED FOR PUBLICATION

No. 129,464

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of S.J.,
a Minor Child.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; JOAN M. LOWDON, judge. Submitted without oral argument. Opinion filed March 20, 2026. Affirmed.

*Chadler E. Colgan*, of Colgan Law Firm, LLC, of Kansas City, for appellant natural mother.

*Kirstyn Dvorak*, assistant county attorney, and *Todd Thompson*, county attorney, for appellee.

Before HILL, P.J., PICKERING and BOLTON FLEMING, JJ.

PER CURIAM: Mother appeals the district court's finding that her daughter, S.J. (born in 2024), was a child in need of care. Father does not appeal. Because Mother shows no legal or factual error, we affirm the district court.

On January 23, 2025, the State filed a petition requesting the district court find that six-month-old S.J. was a child in need of care. It alleged that Mother had tested positive for methamphetamine, ecstasy, and amphetamines. The petition also asserted that Mother had used methamphetamine while pregnant with S.J. and did not have stable housing. Finally, the petition alleged S.J. had a diaper rash "to the point of her buttocks bleeding" and that Mother had requested the Department for Children and Families (DCF) pay for medication because she did not have money, but it was "unknown if [S.J.] received the medicine she needed."

1

At the first appearance hearing on February 18, 2025, Mother challenged the disposition, and the district court set an adjudication hearing on April 9, 2025. Father was not present at the April 9, 2025 adjudication hearing because he was attending inpatient treatment. The district court accepted a proffer as to Father only. Because the hearing exceeded the time allowed, the court scheduled an additional hearing date on April 25, 2025, and again on May 19, 2025.

The State called the following witnesses: Robin McDowell, the former director for Leavenworth's probation department; Amanda Miranda, Mother's caseworker with DCF; Kayla Cook-Gerdes, the foster care caseworker from Cornerstones of Care assigned to S.J.'s case; and Destiny Lytle, the daughter of S.J.'s placement.

McDowell had been Mother's probation supervisor before McDowell retired a week before the adjudication hearing. McDowell testified that she had no information suggesting S.J. had been inadequately fed, inadequately clothed, unclean, or had not received proper medical care. She was also unaware if S.J. had any health problems or had been left unattended. She noted that Mother had a pending probation revocation hearing and that Mother had tested positive for methamphetamines and ecstasy in January 2025.

Miranda testified that Mother came into Miranda's caseload after testing positive for drugs during her prenatal appointments. She frequently checked in on Mother before S.J.'s birth, including in-person visits, and saw S.J. four times, all under Mother's care, before April 9, 2025. The four visits occurred in three different homes, but Miranda was not allowed inside because the residences were not Mother's home.

Miranda testified that she had no concerns with S.J.'s physical, mental, or emotional well-being in September 2024. That said, Mother had not executed a release to provide Miranda access to S.J.'s medical records. Miranda had no concerns with S.J.'s

weight, feeding, clothing, cleanliness, or being left unattended in January 2025. Miranda confirmed that DCF had never made a finding that S.J. had been physically, mentally, or emotionally abused or harmed, and Miranda was not aware of S.J. ever experiencing withdrawal symptoms. Miranda acknowledged that Mother was no longer living with Father.

Miranda was concerned because S.J. had begun crawling and might access drugs or other substances while either parent was under the influence. Mother told Miranda that "she didn't like it when she was high when she was parenting." Mother agreed to participate in a program in which substance abuse counselors came into the home to work with her substances abuse issues while at home, but Mother did not actually engage those services.

Cook-Gerdes testified that, upon intake, S.J. was wearing dirty clothes, appeared underweight, had a severe diaper rash, had a small bruise over her left eyebrow, and "smelled like sour formula with a dash of cigarettes."

Cook-Gerdes did a walkthrough of the place where Mother said she was living but was not satisfied with Mother's living arrangements because it did not seem safe. Cook-Gerdes was concerned because S.J. was able to crawl and there were chemicals on the floor in a closet with no door next to S.J.'s bedroom. She described S.J.'s crib as a small drop-side crib that had blankets and toys in it and a "tiny" mattress. Cook-Gerdes expressed concern with Mother's "substance use; safety of the house; her ability to care for [S.J.] in general which includes feeding, bathing, supervising."

Cook-Gerdes could not "attest" that Mother was living at the residence because Mother had not provided proof she was residing there. Mother also had not verified her income or employment, nor had Mother verified her enrollment in a drug treatment program. Cook-Gerdes admitted Mother told her she had replaced the crib and had

3

moved the chemicals to a safer place, but Cook-Gerdes was unable to verify that claim. Cook-Gerdes testified that she was attempting to schedule a new walkthrough with Mother. Mother did not request another walkthrough until the week before the May 19 hearing.

Cook-Gerdes acknowledged that, when Mother and S.J. had visits, those visits were "going very well." Still, Cook-Gerdes expressed concern with Mother "not being prepared, not bringing bottles, diapers, drinks, anything of that nature," despite being instructed to bring those items "[m]ultiple times." It was clear Mother loved S.J. "to pieces." Cook-Gerdes also acknowledged that S.J. continued to have diaper rashes while in custody.

Lytle explained that S.J.'s father used to be her stepfather. She first met S.J. when S.J. was three days old. Lytle testified she saw S.J. "two or three times a week" and would watch S.J. for "[s]ometimes a couple hours or over the night." There were times S.J. was inappropriately dressed—just wrapped in a blanket even if it was cold outside. Lytle and her mother would bathe S.J., wash her clothes, and wash the diaper bag because of the smell.

Lytle testified that, when S.J. was first placed into custody, her body was dirty, her car seat smelled like cigarettes, and her clothing was dirty. S.J. was in a similar condition "most of the time" Lytle saw her before being taken into custody. Lytle also testified about S.J.'s severe diaper rash when S.J. was around five months old but added that S.J. continued to have diaper rash while in custody but only when she was taking antibiotics. Lytle had not seen either parent using drugs since S.J. was born.

On May 23, 2025, the district court entered a written order finding S.J. a child in need of care, with its findings of fact to be announced at a hearing on June 10, 2025. At the hearing, the court found McDowell, Miranda, Cook-Gerdes, and Lytle were credible

4

witnesses. The district court stated the testimony that Mother acknowledged she did not like how she parented when she was under the influence and the extent of the diaper rash contributed to finding S.J. was a child in need of care. The district court reiterated that this was not a case simply about drug usage but noted that it seemed "as if Mother struggled to appropriately care for the needs of the child as a result thereof." Thus, the district court found by clear and convincing evidence that S.J. was a child in need of care.

The district court then addressed disposition. The State requested S.J. remain in DCF custody but did not object to expanding Mother's visitation time with S.J. The guardian ad litem (GAL) also recommended expanded visitation. Mother requested a continuance of the disposition, which the court granted.

On June 17, 2025, Mother filed a motion to set aside or alter the adjudication finding under K.S.A. 60-259(a)(1)(E). Citing *Wilcox v. Colwell*, 193 Kan. 617, 396 P.2d 315 (1964), she argued S.J.'s medical records were newly discovered evidence which "could not with reasonable diligence have been discovered and produced at the time of trial" and "is of such character and strength as would with reasonable probability have compelled a different decision."

Mother asserted she requested S.J.'s medical records on May 2, 2025, 17 days before the final adjudication hearing. Mother made several requests to HealthMark for S.J.'s medical records but did not receive the requested records until May 23, 2025. Mother contended the medical records showed "normal and consistent" health, well-being, weight, and development under both Mother's care and foster placement's care. As a result, she argued the medical records show that S.J. was not a child in need of care.

The State responded that S.J.'s medical records were records that reasonable diligence would have discovered in time to produce at trial. It noted that Mother did not request the records "until 24 days after the April 9, 2025 adjudication hearing."

5

On July 1, 2025, the district court considered Mother's motion to set aside or alter the adjudication. After hearing argument, the district court noted that the petition filed on January 23, 2025, included concerns about S.J.'s physical health, including her diaper rash and "bleeding buttocks." The district court denied the motion because Mother did not attempt to procure the records until after testimony began.

The district court proceeded to disposition, and the State again requested that S.J. remain in DCF custody. The State had no objection to increased visits and increased minimum visitation between Mother and S.J. Mother requested custody of S.J. with "whatever reasonable and appropriate conditions the Court deems necessary." The GAL expressed some concern but also recommended reintegration and giving Mother time to work the reintegration plan.

The district court ordered Mother to report to community corrections to complete a drug test. Based on the results, the State requested Mother "put together some negative [drug tests]" before increasing Mother's visitation. The district court ordered expanded visitation but required Mother to remain current with drug testing, remain in contact with Cornerstones of Care, and maintain visitation with S.J.

Mother appealed. Additional facts will be included as necessary.

I.      *The State Presented Clear and Convincing Evidence S.J. Was a Child in Need of Care*

*Standard of Review*

Under K.S.A. 38-2250, a petitioner "must prove by clear and convincing evidence that the child is a child in need of care."

6

"'[W]hen an appellate court reviews a trial court's determination that a child is in need of care, it should consider whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the child was a [child in need of care].'" *In re F.C.*, 313 Kan. 31, 40, 482 P.3d 1137 (2021).

In making this determination, an appellate court will "not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020).

*Discussion*

A parent has a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution to make decisions regarding the care, custody, and control of the parent's child and is entitled to due process before the parent can be deprived of these rights. *In re P.R.*, 312 Kan. 767, 778, 480 P.3d 778 (2021). Because child welfare is a matter of state concern, however, the State may assert its interest "through state processes designed to protect children in need of care." *In re A.A.-F.*, 310 Kan. 125, 146, 444 P.3d 938 (2019).

K.S.A. 2025 Supp. 38-2202(d) defines "[c]hild in need of care" and provides 14 situations in which a child may be adjudicated a child in need of care. Here, the State's petition alleged two grounds for finding S.J. was a child in need of care. First, S.J. "is without adequate parental care, control or subsistence and the condition is not due solely to the lack of financial means of the child's parents or other custodian" pursuant to K.S.A. 2025 Supp. 38-2202(d)(1). Second, S.J. was "without the care or control necessary for the child's physical, mental or emotional health" under K.S.A. 2025 Supp. 38-2202(d)(2).

Mother asserts this is a case about "concerns" and that "[a] diaper rash and one positive drug test result cannot automatically rise to the level of a child in need of care with no connection to the health and well-being of S.J." She argues that there was no evidence S.J. was not adequately fed, clothed, supervised, or was left in an unsafe environment. Similarly, she contends there was no evidence S.J. did not have "adequate and appropriate shelter, or that S.J. was not receiving regular and proper medical care through her pediatrician."

In contrast, the State argues there was sufficient evidence to find that S.J. was a child in need of care and the district court did not err. It contends the district court did not find S.J. was a child in need of care based on Mother's drug usage but because Mother "struggled to appropriately care for S.J. as a result" of her drug usage.

Both parties cite extensively to *In re L.C.W.*, 42 Kan. App. 2d 293, 211 P.3d 829 (2009), and *In re A.M.*, No. 106,890, 2012 WL 2925660 (Kan. App. 2012) (unpublished opinion). Mother suggests these cases are instructive because in both cases the State focused on the parents' drug usage and not the well-being of the child. The State counters that, here, the district court heard evidence about how the parents' drug usage affected S.J.'s health and welfare.

In *In re L.C.W.*, the State alleged L.C.W. was a child in need of care because she was "always dirty," "often unattended when the parents were asleep during the daytime hours while the child was awake," and L.C.W.'s "grandparents found methamphetamine in the parents' car and believed that the parents were using." 42 Kan. App. 2d at 299. In addition, L.C.W. was not regularly seeing her pediatrician, the grandparents believed the parents were using methamphetamine while the child was in their care and control, neither parent was working, and both parents had been arrested. 42 Kan. App. 2d at 299.

At the evidentiary hearing, there was competing testimony regarding the parents' drug use. And the mother and father had been arrested for trespassing, burglary, and theft. L.C.W.'s doctor testified that she did not have concerns for L.C.W.'s "physical or mental well-being or safety" and had "no concern" for the mother's ability to parent L.C.W. 42 Kan. App. 2d at 300.

Following the evidentiary hearing, a district magistrate judge found that L.C.W. was a child in need of care. The parents appealed the decision to the district court, which found that the State had failed to prove that L.C.W. was a child in need of care by clear and convincing evidence. The State appealed.

The *In re L.C.W.* panel "concede[d] the case was more difficult than some." 42 Kan. App. 2d at 298. The panel applied a negative finding standard of review because the district court found that the State had failed to meet its burden. Under this standard of review, "a negative finding . . . may not be reversed unless there was an arbitrary disregard of undisputed evidence or the district court's ruling was a result of bias, passion, or prejudice." 42 Kan. App. 2d at 302. The *In re L.C.W.* panel concluded the district court did not arbitrarily disregard undisputed evidence and the district court's ruling was not the result of bias, passion, or prejudice. It continued: "Moreover, given that this was a very close case, we are convinced that a rational factfinder could have found by clear and convincing evidence that L.C.W. was not a child in need of care." 42 Kan. App. 2d at 302. The panel noted that "L.C.W.'s physician clearly had no concern over mother's fitness as a parent" and testified L.C.W. was "'clean, well-nourished, growing appropriately, and no developmental delays were noted.'" 42 Kan. App. 2d at 302. The panel agreed that "L.C.W.'s parents may not be model parents, but we agree with the district court in focusing on the well-being of the child." 42 Kan. App. 2d at 302-03.

Similarly, in *In re A.M.*, the father appealed the district court's finding that his children were children in need of care. After A.M.'s mother was arrested for second-degree murder, A.M. arrived at a juvenile intake "'very dirty, smelling strongly of cigarette smoke and soaked in baby formula.'" 2012 WL 2925660, at *1. The father submitted to a drug test which returned positive for methamphetamines. As a result, the State alleged the children were children in need of care.

The father requested a full trial on the CINC petition. Law enforcement testified regarding the mother's arrest for homicide and "the appalling condition of A.M. when she was taken into police custody." 2012 WL 2925660, at *2. The social worker testified the father had tested positive for methamphetamine but that she had "no concerns about the welfare of the children" before the positive drug test. 2012 WL 2925660, at *2. The father testified that "the children's physical and medical needs were being met, they were doing well in school, and he could provide financially for them." 2012 WL 2925660, at *3. The district court found the children were children in need of care, stating, "'And this court has for 25 years held a standard that if you're using drugs, you can't have your children, period.'" 2012 WL 2925660, at *3. The father appealed.

The *In re A.M.* panel noted that "the only factor discussed by the trial court was Father's positive drug test for methamphetamine." 2012 WL 2925660, at *6. After acknowledging that "we have seen the consequences of drug users addicted to methamphetamine," the panel noted that a CINC case "is focused entirely on the well-being of the children." 2012 WL 2925660, at *6. The panel found the State presented no evidence of "any inadequate care and well-being of all the children while they were in the Father's custody." 2012 WL 2925660, at *6. Like the panel in *In re L.C.W.*, the *In re A.M.* panel believed it was a "close case. . . . While drug use by parents will often support removal of children from a drug abuser's home, it does not here." 2012 WL 2925660, at *7.

10

Both *In re L.C.W.* and *In re A.M.* stand for the proposition that a child cannot be declared a child in need of care based solely on the parent's or parents' drug use. Other panels of this court have affirmed child in need of care findings when the parent's or parents' drug use *affected* the child's care and well-being. See *In re N.M.*, No. 118,653, 2018 WL 2749803, at *6 (Kan. App. 2018) (unpublished opinion) (Mother admitted having a drug problem but resisted efforts to help her confront her addiction because she did not see her drug use as a serious matter and youngest child was exposed to drugs "both before and after the child's birth"); *In re B.G.*, No. 109,513, 2013 WL 4404574, at *4-6 (Kan. App. 2013) (unpublished opinion) (Mother did not recognize the negative effect of drug use on her functioning despite admitting she lived in a "'walking blackout'" at times and her children had been in a vehicular accident while Mother was driving under the influence.).

This case is more like *In re N.M.* and *In re B.G.* than it is to *In re L.C.W.* and *In re A.M.* Here, Mother told Miranda "she didn't like it when she was high when she was parenting" and agreed to participate in at-home substance abuse counseling but did not follow through with the substance abuse counseling. Similarly, when Cook-Gerdes did her walkthrough, S.J.'s crib was inappropriate and there were easily accessible chemicals on the floor of the hallway closet. Although Mother reported that the problems had been resolved, Cook-Gerdes testified that "with things that have been happening, I have to verify everything she tells me because a lot of the information I'm given by her is contradictory to what is factual." Although Mother sent a picture of the unassembled crib, she did not send pictures of the assembled crib or hallway closet after addressing the issues. Nor did Mother request a new walkthrough until the week before the May 19, 2025 hearing. Cook-Gerdes also testified that Mother was not prepared for visits with S.J. and did not bring "bottles, diapers, drinks, anything of that nature" despite being instructed to bring those items to visits "[m]ultiple times."

When she was taken into custody, S.J. was wearing dirty clothes and "smelled like sour formula with a dash of cigarettes." The smell was so bad that Cook-Gerdes initially did not want to hold S.J. Lytle testified similarly, indicating S.J. smelled like "rotten milk" and "cigarettes" when she was initially placed into custody. S.J. had not been recently bathed, and there was "black stuff" underneath her neck and fingernails. Lytle testified that she had seen S.J. two or three times a week since her birth and S.J. was in a similar condition "most of the time" before being taken into custody.

Cook-Gerdes also explained that S.J. also had a "very severe" diaper rash that was "[v]ery red, very raw" and was so bad it was possibly bleeding when she was taken into custody. Lytle also described the diaper rash as "really red down there" and that S.J.'s diaper rash was bleeding. After S.J. was taken into custody, Lytle said S.J. still occasionally got diaper rash, but only "when she has ear infections and [is] taking her antibiotics." Lytle also explained that the diaper rash was never as severe; the diaper rashes no longer bled; and the rash was not as red because it was treated as soon as it was noticed.

Viewed in the light most favorable to the State, we find there is clear and convincing evidence that S.J. was a child in need of care. See *In re F.C.*, 313 Kan. at 40. Despite Mother's argument otherwise, the district court did not find that "a diaper rash and one positive drug test result . . . automatically [rose] to the level of a child in need of care with no connection to the health and well-being of S.J." Instead, the district court found that Mother's drug usage affected her ability to care for S.J. We agree.

II.      *The District Court Did Not Err When It Denied Mother's Motion to Alter or Amend Its Ruling*

*Standard of Review*

The district court has discretion to grant or deny a motion for new trial under K.S.A. 60-259(a). An appellate court will not disturb the district court's ruling on a motion for new trial unless the district court abused its discretion. *Miller v. Johnson*, 295 Kan. 636, 684, 289 P.3d 1098 (2012), *abrogated on other grounds by Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 442 P.3d 509 (2019). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. The party asserting the district court abused its discretion bears the burden of showing such abuse of discretion. *In re A.S.*, 319 Kan. 396, 400, 555 P.3d 732 (2024).

*Discussion*

Under K.S.A. 60-259(a)(1), a district court may grant a new trial "to all or any of the parties and on all or part of the issues" for several reasons. Only one of these reasons is relevant here:  "newly discovered evidence that is material for the moving party which it could not, with reasonable diligence, have discovered and produced at the trial." K.S.A. 60-259(a)(1)(E). "After a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones and direct the entry of a new judgment." K.S.A. 60-259(a)(2).

To succeed on a motion for new trial, the movant must show:  "(1) 'the new evidence could not, with reasonable diligence, have been produced at trial,' and (2) 'the evidence is of such materiality that it would be likely to produce a different result upon

13

retrial.'" *State v. Warren*, 302 Kan. 601, 615, 356 P.3d 396 (2015). The court must consider the credibility of newly proffered evidence to determine whether the evidence is material. A new trial is not typically warranted if the newly discovered evidence "'merely tends to impeach or discredit the testimony of a witness.'" 302 Kan. at 615.

On appeal, Mother argues the district court erred when it declined to grant a new trial because S.J.'s medical records were newly discovered evidence. She makes three arguments. First, she contends that the petition was insufficient to put her on notice that S.J.'s medical records would be necessary until she heard witness testimony at the adjudication hearings. Mother asserts that "[i]t was not until the testimony on April 25, 2025 concerning diaper rash from Ms. Cook[]-Gerdes, that an issue was raised regarding S.J.'s health." Next, Mother asserts that she acted with reasonable diligence to obtain the medical records because she requested them 17 days before the May 19, 2025 adjudication hearing and reached out to HealthMark at least seven times. Finally, Mother suggests there was a reasonable probability that S.J.'s medical records would compel a different result.

The State counters that S.J.'s medical records were not "newly discovered." It argues Mother could have produced S.J.'s medical records had she exercised reasonable diligence rather than waiting to request the records "until roughly two weeks before the third adjudication setting" and without subpoenaing S.J.'s doctor to testify regarding S.J.'s physical condition.

At the hearing on the motion for new trial, Mother argued that "until . . . the testimony came out on April 26th, there was no evidence presented to the Court with regard to diaper rash or, really, any concern about [S.J.'s] health." As a result, she contended that she satisfied the due diligence requirement. The district court denied Mother's motion to reconsider based on newly discovered evidence, stating:

14

"As it relates to the motion to con—reconsider, specifically as it raises newly discovered evidence, the Court will note that the original petition that was filed in this particular case, which is the document that provides notice of the—of what the State is going to be seeking as it relates to proposed, effectively, findings, that petition was filed on January 23rd of 2025. That specifically references within the petition various aspects but does include concerns about the child's physical health as it relates to the bleeding buttocks and also whether or not there was additional follow up or follow through with Mother.

"Again, reading just even the last two sentences, Amanda Miranda asked [Mother] how much [the medication of S.J.] was, and [Mother] said she would call wol— Walgreens and call right back. [Mother] returned the phone call at 5:49 after business hours. It's unknown if [S.J.] ever received the medication she was needing. That's specifically as it relates to the bleeding diaper rash.

"And so the logic, I—I'm not following the logic, candidly. I mean, this was originally set, and clearly the parties underestimated the amount of time that they needed to address this particular adjudication hearing, but this should have been done in one day. And if the State would've presented evidence and had accurately assessed the time that they needed to present that evidence, there never would be any recourse if the logic is that it has to be verbally presented in testimony at an adjudication hearing before there has to be any follow through with this case. That's—that's not the standard, and—and that has not been in child in need of care cases or, candidly, offender or criminal cases either."

The petition stated: "Later, on January 17, at 3:41 p.m., Mother called CPS Miranda to inform her that [S.J.] had been seen by the doctor and had a diaper rash to the point of her buttocks bleeding. . . . It is unknown if [S.J.] received the medicine she needed." The district court correctly stated that the petition clearly established that S.J.'s physical health—including an allegedly bleeding diaper rash—were at issue in the case. Similarly, the district court correctly noted that Mother waited until after the *second* adjudication hearing before requesting S.J.'s medical records. Had testimony concluded at either of the first two hearings, Mother's evidence would have simply been untimely.

15

On appeal, Mother does not identify an error of law. Nor does Mother argue that the district court's decision was arbitrary, fanciful, or unreasonable. She only argues the district court made an error of fact—when she had sufficient notice that S.J.'s physical condition was at issue to request the medical records. But the district court did not err; the petition placed S.J.'s physical condition—including the specific allegation Mother claims she was unaware of until April 25, 2025—at issue. Mother has not shown the district court erred when it denied her motion for reconsideration based on newly discovered evidence.

Affirmed.